JAMES M. HUNTER, ADMINISTRATOR OF A. R. S. HUNTER, VS. RICHARD BRADFORD, ADMINISTRATOR OF LEIGH READ, DECEASED, ET AL.

An answer asserting the ignorance of the defendant as to the truth of the allegations and charges of a bill, but averring that he does not believe them to be true, is not sufficient to warrant the dissolution of an injunction which has been granted as a proper auxiliary to the relief sought. Where the insolvency of an estate is charged in a bill, the answer of the administrator that he is ignorant of such insolvency is not a sufficient denial of the charge.

Courts draw a distinction as to claims for equitable interposition, between contracts *executory* and contracts *executed.* It is well settled, that where the purchaser takes a deed with warranty, and enters and remains in undisturbed possession of the land conveyed, (the purchase money having been paid,) if there is no fraud in the transaction, he cannot, before eviction, ask and obtain the aid of a Court of Equity, in order to have the contract rescinded, or the purchase money restored to him, on the ground of defect in the title. In such a case, his remedy is at law upon the covenants in his deed of warranty.

But if the purchaser is in possession, under a mere agreement to convey and make title, as where a title bond has been given, and the vendor is not able to make a clear and perfect title, he has the right to resort to a Court of Equity to rescind the contract—to restrain the collection at law of the purchase money, and to obtain restitution of whatever sums have been paid by him, on the faith of getting a title from the vendor.

In the case of an executed contract, where the conveyance has been made and accepted, Courts will interpose to rescind the contract, where it is rendered proper and necessary, by reason of the fraud or insolvency of the vendor.

On the 22d December, 1839, Leigh Read and Archibald R. S. Hunter entered into an agreement for the sale and purchase of land, negroes and other property, amounting to $27,500. On the 2d of January, 1840, Read executed a title bond for the land, conditioned to make title on the 1st of January, 1843. The land and negroes

sold to Hunter by Read were mortgaged to the Union Bank of Florida, by deed of mortgage bearing date September 3, 1839.

On the day of the sale, Hunter executed three promissory notes to Read, for the sum of six thousand one hundred and sixty-six dollars and sixty-six and two-third cents each, payable one, two, and three years after date.

At the time of the purchase, Hunter held an obligation of Joseph McBride, given by him on the 30th of January, 1838, on the occasion of his, McBride's, purchase from A. R. S. Hunter and James M. Hunter, and A. R. S. Hunter, guardian of William H., Hiram S. and Grace F. Hunter, minor heirs of Adam Hunter, late of the county of Gadsden, deceased, of " all the land, negroes stock and every other thing or things upon or belonging to the plantation," owned by their father, the said Adam Hunter. In May, 1840, this obligation was transferred to Read by A. R. S. Hunter, one of the joint obligees, acting for himself and the other heirs of Adam Hunter, in part payment of the property purchased from Read, or as collateral security for the payment of the notes executed by him. A. R. S. Hunter and Leigh Read both died in the spring of 1841—but before their death, Hunter had paid large sums of money on the aforesaid purchase from Read.

In May, 1844, James M. Hunter filed his bill of complaint in the *then* Superior Court of Leon County, as administrator of A. R. S. Hunter, against Richard Bradford, administrator of Leigh Read, deceased, Julia McBride, executrix of Joseph McBride, deceased, and Robert B. Haughton, agent of Mrs. McBride—setting forth the aforesaid purchase, payments and transfer—the execution of notes for the purchase money by Hunter—the insolvency of the estate of Read, and its consequent inability to make a good title to the property sold by him in his life time to complainants' intestate—by removing the incumbrances thereon, consisting of the aforesaid mortgage to the Union Bank, to secure one hundred and twenty-seven shares of stock in that institution, and $8,466 of borrowed money, and praying that Bradford, the administrator of Read, be perpetually enjoined from collecting any further sums on the notes given by complainants' intestate, and that the said Julia McBride, and R. B. Haughton, her agent, be perpetually enjoined from paying any part of the obligation of Joseph McBride to the said Bradford.

In December, 1845, the complainant filed a supplemental bill, stating that, since the filing of the first bill in 1844, Bradford, as administrator of Read, had recovered judgment against him, as administrator of A. R. S. Hunter, for the sum of $9,432 34-100, the balance due on the notes given by his intestate, and praying that the said Bradford be perpetually enjoined, for the reasons stated in the original bill, from collecting any part of said judgment. The injunction prayed for was granted on the 10th December, 1845—after which, Bradford filed his answer.

On the ninth day of June, 1847, Hiram Hunter and Richard B. Carpenter and wife, (Carpenter having intermarried with Grace F. G. Hunter, one of the heirs of Adam Hunter) filed their bill of complaint in Leon County Circuit Court against Julia McBride, executrix and sole heir of Joseph McBride, deceased, Robert B. Haughton, Richard H. Bradford, administrator of Leigh Read, James M. Hunter, in his own right, and also as administrator of his brother, Archibald R. S. Hunter—setting forth, that Grace and Hiram are two of the children of Adam Hunter, and as such, entitled to a distributive share of his estate—that in order to ascertain the share to which they were entitled, proceedings were instituted in the County Court of Gadsden County, which resulted in allotting to them certain specified portions of said estate on the 27th January, 1838—that at that time, they were minors, and that A. R. S. Hunter was their guardian, and continued to be such until his death, in the spring of 1841.

The bill then states the purchase by Joseph McBride, on the 30th of January, 1838, from A. R. S. Hunter, of the whole estate of Adam Hunter, including the shares allotted to complainants, and assigned to them as their separate and specific property, their guardian agreeing as specified in the McBride obligation, to pay them the prices at which said allotted shares were valued. The indebtedness of A. R. S. Hunter to Leigh Read is then set forth, and the delivery of the McBride obligation to the latter as collateral security for said indebtedness. The bill charges, that before the delivery of said obligation, a part of it had been paid to A. R. S. Hunter, and that still further payments have been made since that time, but that some six thousand dollars are still due and unpaid. That the obligation was due in equal portions to the heirs of Adam Hunter—that the amounts paid exceed the shares of Archibald, James M. and William, and

that the balance will not be sufficient to pay the shares of complainants who allege that they have never received any part of the same. The estate of Read is alleged to be insolvent, and if so, that the estate of Archibald R. S. Hunter will be insolvent also. Complainants therefore allege, that the balance due on the McBride obligation ought to be paid to them, and that Bradford and James M. Hunter ought to be enjoined from collecting or receiving any part of it. The prayer of the bill is in accordance with and framed upon this statement of facts.

The answers filed by all the defendants in these cases, (which were consolidated and tried together,) and the exhibits and proofs in the two cases, do not present a different state of facts, or vary materially the facts presented and the case stated in the bills of complainants. The questions raised and presented for adjudication are stated in the opinion of the Court.

On the 29th July, 1847, complainants moved the Court for an interlocutory decree against Julia F. McBride and Robert B. Haughton, who admit in their answers that they are indebted upon the obligation mentioned in the pleadings in the sum of $3957 and 25–100 with interest thereon since the first day of May, 1838. But inasmuch as Richard H. Bradford claims the fund as belonging to the estate of Read: It was therefore ordered, adjudged and decreed, that Julia F. McBride, executrix and sole heir of Joseph McBride, and Robert B. Haughton, pay to the clerk of the Court, as receiver, the said debt and interest, on or before the first day of April, 1848. This decree was made without prejudice to the rights or claims of the parties claiming the fund, and the money so paid to the clerk, as receiver, was to remain in his hands subject to the further order of the Court.

On the 20th of January, 1849, it was ordered, adjudged and decreed, in the Court below, that the bill of complaint of Carpenter and wife, and Hiram S. Hunter, be dismissed, and the judgment obtained against Hunter's administrator by Read's administrator, was referred to the master to calculate and ascertain the amount actually due upon said judgment in accordance with directions given by the Court as to the manner in which such calculation was to be made, and the balance due to be ascertained. And on the 22d January, 1849, the report of the master having been made and confirmed, it was ordered, adjudged and decreed, (the parties consenting that a final decree may

be rendered at this time) that the injunction heretofore granted in this cause restraining Richard H. Bradford from proceeding at law upon the judgment *quando acciderent*, rendered against James M. Hunter, administrator of A. R. S. Hunter, in favor of said Bradford as administrator of Leigh Read, deceased, in Leon Superior Court on the 27th day of February, 1845, for $9432 34–100, and restraining said Bradford from proceeding to receive or collect any sum of money from the estate of Joseph McBride, still due from said estate upon the obligation mentioned in the pleadings as having been transferred to Leigh Read by A. R. S. Hunter, be dissolved, and the bill dismissed—and that each of the parties pay their own costs.

From the decree rendered in these cases, the complainants appealed.

*Walker* argued the cause for appellants.

*Stephens & Baker*, for appellees, argued and maintained at great length the following propositions:

This is the ordinary case of a purchaser seeking relief upon the ground of an outstanding incumbrance. The incumbrance consists of a mortgage in favor of the Union Bank of Florida, evidenced by deed duly recorded, of which the complainants' intestate not only had constructive but actual notice.

1. It is well settled that, when the purchaser with full knowledge that the title is defective, enters upon the purchase, takes possession of the property, binds himself to pay the purchase money by a given day, and takes the usual covenants for title, a Court of equity will afford no relief. 2 Kent. Com., 471. 2 John. Ch., 519. 1 John. Ch., 213. 1 A. K. Marsh, 288. 7 Smedes and Marsh, 256.

2. There is neither fraud, concealment, or eviction alleged in the bill. In 2 John. Ch., 523, Ch. Kent says: "I know of no case in which this Court has relieved a purchaser where there was no fraud and no eviction." In Bumpus vs. Platner, 1 John. Ch., 213, the same Chancellor says: "It may be safely said that there is no case of relief on this ground (failure of consideration) after the agreement is executed, when the possession has passed and continued without any eviction at law under a paramount title. A purchaser buying with full knowledge of the defect in the title, will not, for that defect, be relieved in equity." 3 A. K. Marsh, 288. See also, Royster vs. Shackelford, 5 Litt., 229. 2 Edwards, 37.

35

"The principle is fully established, that in cases free from fraud, a purchaser of land who is in possession cannot have relief in Chancery against his contract to pay on the mere ground of a defect of title without previous eviction." Vick vs. Perry, et al., 7 Smedes & Marsh., 268. Anderson vs. Lincoln, 5 How., 284.

3. When the purchase money became due, the vendee should have tendered the same to the vendor and demanded the title deeds. If the vendor refused to make titles, the vendee might have filed his bill in equity asking a specific performance, and the Court would have compelled the vendor to make titles or release the purchaser from the contract.

4. If it should be contended that the vendor in this case was bound by his contract to make title on the 1st January, 1843, that the day had passed when the bill of complaint was filed, and no title made, we say that although the vendor has not a good title, when the land according to the terms of the contract ought to be conveyed, yet if he can at any time before final decree, make a good title, the Court will compel a specific performance. If the purchaser had asked a specific performance and tendered the purchase money, or paid it into Court, a title could have been procured before final decree. Wynne vs. Morgan, 7 Ves., 403. Mortlock vs. Bullock, 10 Ves., 315. Langford vs. Pitt, 2 P. Wms., 629, 630. Coffin vs. Cooper, 14 Ves., 205. Hepburn vs. Auld, 5 Cranch, 262. Same vs. Dunlap, et al., 1 Wheat., 179. Cooper vs. Dennis, 1 Ves., 565, note 6.

Time, in this case, was not of the essence of the contract. The vendee has waived his right to insist upon relief upon this ground by not making the objection promptly on the day. Waters vs. Travis, 9 John., 46. Seaton vs. Slade, 7 Ves., 265, note 7. Wynne vs. Morgan, 7 Ves., 203. Fordyce vs. Ford, 4 Br. Ch., 371. Sugden on Vend., 281 to 288. 2 Story E., 776. Marquis of Hertford vs. Bowe, 5 Ves., 718, note a. Rogers vs. Saunders, 16 Maine R., 99. Brasier vs. Gratz, 6 Wheat., 207. Garnet vs. Macon, 6 Call, 308. Runnels vs. Jackson, 1 How. Miss., R., 358.

5. The defendant, in his answer, offers to make title whenever the complainant will comply with the covenants of his intestate. These covenants (as the proof shows) were all violated; he has therefore no right to complain. 2 Story Eq., 771. 4 Rand., 481. 7 Conn., 53. 6 Conn., 13.

6. There was no eviction at the time the bill was filed. The complainant then, according to the principles asserted in the cases cited, has no claim to the aid of a Court of equity, but must be left to the remedy which he elected for himself—the covenants in the deed.

7. If it be contended that, although neither fraud, concealment, or eviction be alleged in the bill, yet that an eviction by the Union Bank is proved by an exhibit in the cause—then we insist that an eviction in 1848 cannot be used for the purpose of helping out the case made by the bill in 1844. At the date of the bill, the complainant was in the undisturbed possession of the property.

8. The proof shows that only a part of the property purchased by Hunter of Read was sold by the bank in 1848, viz : the land and a part of the negroes. The complainant retains possession of the balance.

9. It is by no means clear that Archibald Hunter owned any of the property (except the land) when it was sold by the bank. It appears from the deposition of J. M. Hunter, that he had purchased the whole of the Read property of his brother by verbal contract— land, negroes, &c. Pages 32 and 33 of printed record. The contract, not being reduced to writing, of course passed no title to the land ; but the contract being upon sufficient consideration, and possession being delivered, the title to the personal property passed to the purchaser. The consideration is stated to be the payment of certain debts assumed by James for Archibald—page 33—and the payment to the heirs of what was due them—page 32. He bought subject to the bank incumbrance—pages 34, 35. The contract was made in March, 1841, and he was in possession in 1847. If James Hunter failed to pay the heirs what was due to them or the other debts which he had assumed, this is an affair to be settled between himself and the estate of Archibald Hunter. It is sufficient for us to show that he made the purchase. It devolves upon him to prove that he was released from his contract by Archibald Hunter in his life time. If James M. Hunter purchased the negroes and personal chattels of Archibald Hunter for a consideration, which the latter deemed adequate, then Archibald Hunter could not resist the payment to Read's estate, upon the ground of " failure of consideration."

10. Is Archibald Hunter's administrator entitled to recover the balance due on the McBride obligation ? We insist that he is not,

unless he has made such a case by his bill as would entitle a purchaser to recover back the purchase money. This obligation was transferred to Read by Archibald Hunter, in part payment of the property purchased. He cannot retain the property, and recover back the purchase money. The proof shows that he was in possession when his bill was filed—he neither asks for a title, offers to pay for one, nor does he offer to surrender the property.

11. Are the complainants, Hiram Hunter, and Carpenter and wife, entitled to recover the balance due on the McBride obligation? It appears from the record, that it was transferred by Archibald Hunter to Leigh Read, in part payment of property purchased by said Hunter, for the joint benefit of himself and the minor heirs of Adam Hunter, Hiram and Mrs. Carpenter being two of them. 7 John. Ch., 155, and cases cited.

12. The transfer was made in good faith by the guardian, and for the benefit of the wards. There is no fraud alleged, or pretended. The wards, after they became of age in 1842, ratified the act of their guardian in making sale of their property in Gadsden, by giving bills of sale to the purchaser—and they ratified the act of their guardian in making the transfer of this obligation by more than five years of acquiescence after full age, with a perfect knowledge that the transfer had been made, and of the purpose for which it was made.

"Minors, when they attain full age, must express their dissent to the act of their guardian within reasonable time." 2 Kent's Com., 195, 6. 6 Con., 506. 2 Kent's Com., 237. 11 John., 539. 14 John., 124. 8 Taunton, 35, 39. "Assent of the minors may be inferred from circumstances, without an express act of ratification." See authorities above cited.

*M. A. Long*, for appellants :

The argument on the other side is totally irrelevant to the case stated in the bill. The object of the bill is not to rescind the contract, nor to have a specific performance thereof. The contract cannot be rescinded, and both parties put in *statu quo*, because Read is dead and wholly insolvent, and, therefore, cannot return to Hunter the thirteen thousand dollars paid towards the purchase money. A specific performance cannot be had, because Read is dead and

wholly insolvent, and therefore cannot remove the bank incumbrance, so as to be able to make a good title. The facts stated in the bill and admitted in the answer show this fully.

On the contrary, the bill prays that the payment of the balance of the purchase money be perpetually enjoined, because Read's estate can neither make title to the property sold, nor answer in damages for failure therein. The existing incumbrance on the property, at the filing of the bill, and the death and total insolvency of Read, make this naturally, and, therefore, legally certain. Therefore, Hunter's recourse at law, upon the covenants of warranty as to the slaves, and for title to the land, was and is wholly worthless. This is the ground upon which relief in equity is claimed. The proof shows that what the bill alleged would actually happen, without the possibility of doubt, has, since the filing of the bill, actually occurred—the land and negroes have been sold under the bank incumbrance. The human mind can scarcely conceive of a case of more flagrant injustice than to allow Read's estate to receive the balance of the purchase money from Hunter's estate, when it is admitted that Hunter's estate has lost the property, and can never collect any damages at law therefor, because of the hopeless insolvency of Read's estate. This proposition is too self-evident to be capable of being made more obvious by argument. The accidental and unforeseen death and insolvency of Read, the vendor, will, unless relieved against, work an injury to Hunter's estate. This is one of the most familiar heads of equity jurisprudence. Story's Eq., 93

"It may, therefore, be truly said, that the concurrent jurisdiction of equity extends to *all* cases of legal rights, *where, under the circumstances*, there is not a plain, *adequate* and *complete* remedy at law :" says Mr. Justice Story, 1 Con. 94.

Hunter's remedy at law, upon his covenants, upon which it is said he must wholly rely, is not "*complete*," because it is admitted that any judgment for damages which he may recover, *can never be paid*, and, therefore, is wholly "*inadequate*" to compensate him for the loss of the property which he purchased.

On the same page, (94,) Mr. Story says: "By the term *accident* is here intended, not merely inevitable casualty, or the act of Providence, or what is technically called *vis major*, or irresistible force ; but such unforeseen events, misfortunes, losses, acts or omissions,

as are not the result of any negligence or misconduct in the party." And on page 115, (sec. 100,) the same author, speaking of cases of accident, says, "they all proceed upon the same common foundation, that there is no *adequate* or *complete* remedy at law under all the circumstances—that the party has rights which ought to be protected and enforced; or will sustain injury, loss, or detriment, which it would be inequitable to throw upon him." The application of this principle to the case at bar, is so plain that comment would seem useless. Hunter buys land and negroes on credit for $27,500. Of this sum, he is to pay nine thousand in cash notes, to be executed by Joseph McBride's executors and others—and for $18,500, he executes three promissory notes, payable one, two and three years from date. For the negroes, he takes a bill of sale, with warranty of title; and for the land, a bond for title, to be made prior to the falling due of the last of the said purchase money notes. The covenants are thus made independent, by fixing different times for the performance by each party of his part of the contract. Hunter pays upwards of thirteen thousand dollars in cash upon the notes, before that sum is due upon them, and delivers to Read an obligation on the estate of McBride for a part of the cash notes. At this point of time, both Read and Hunter suddenly die. Read's administrator brings suit upon the notes, and puts Hunter's administrator to prove all payments made thereon. This he does, to the extent of $13,040, or more, and a judgment, *quando acciderint*, is rendered against him for the balance, near ten thousand dollars. It then becomes manifest that Read's estate is insolvent, and of course can never become otherwise. Hunter's administrator finds that the property in possession of his intestate is mortgaged to the bank, and subject to be sold upon a stock note judgment of Read. What was his duty in the premises? Ought he to have paid the judgment for the balance of the purchase money and the cash notes? We say, certainly not, because his remedy over upon the accounts was wholly inadequate—the estate of Read being insolvent, and obliged ever to remain so. If the administrator of this insolvent estate was permitted to collect from Hunter's estate the amount of the judgment against it, and from the McBride estate the amount of the cash notes, it was obvious that Hunter's estate would suffer irreparable injury thereby. To prevent this mischief, he has applied to a Court of Equity. If the

mischief had only been *probable*, and not *certain*, as in this case, he would have had this right.

Speaking of bills *quia timet*, Mr. Story says: " They are ordinarily applied to prevent wrongs or anticipated mischief, and not merely to redress them when done. The party seeks the aid of a Court of equity because he fears (*quia timet*) some future probable injury to his rights or interests ; and not because an injury has already accrued, which requires any compensation or other relief. The manner in which this aid is given by Courts of equity, is, of course, dependent upon circumstances. They interfere, sometimes, by the appointment of a receiver to receive rents or other income ; sometimes by an order to pay a pecuniary fund into Court, and sometimes by the mere issuing of an injunction ; thus adapting the relief to the precise nature of the particular case, and the remedial justice required by it." 2 Story's Eq., 130, and authorities there cited.

It will be seen from the record, (page 12,) that on the 10th of December, 1845, an injunction was granted as to the judgment, and a receiver appointed to collect and pay into Court the money due from the McBride estate, in literal conformity to the above authority.

It will also be further apparent from the evidence in the record, that every fact stated in the bill, as the ground for granting this relief, has been fully proven, without the least conflict of evidence as to any one fact ; and the Court below would, doubtless, have rendered a final decree for complainant, but for what it considered evidence of other facts, offered by way of confession and avoidance.

Upon this point, I think a few words will make the error of the Court below quite glaring.

Bradford offered the evidence of Bembry to prove that Read was not bound to remove the Bank incumbrance, incurred by the stock mortgages, bond and note executed by Read ; but that Hunter was, by the contract, bound to remove this incumbrance. Now, we say, that this proof was wholly inadmissible, could it have been made, because it was in direct contradiction of the written contract itself. That written contract is in the record, and will be found just as I have hereinbefore stated the same, and I trust that there can be no reason at this day to hunt up authorities to prove that written contracts, under seal, may not be contradicted, enlarged, or in any manner altered by parol evidence. My colleague has sufficiently dwelt upon this point.

But when the evidence of Bembry is examined, it will be found that he does not pretend that any body told him, even, that by the original contract, Hunter was to assume and pay the Bank incumbrance. He states the contrary positively, and that on the Tuesday before Read's death, near a year and a half after the date of the contract, Hunter told him that he had then agreed upon a settlement with Read, which made them about even, whereby Hunter was to assume the payment of the Bank debt, and Read was to assign his stock to Hunter. Now, both parties died without executing this verbal agreement, if any such was made, and Read's administrator, instead of treating the matter as concluded, refused at all times to convey the stock, and sued upon the purchase money notes. The Court below was not justified therefore, in saying that Hunter was bound to remove the Bank incumbrance, and in decreeing accordingly. There was no pretence for this. It was nothing less than enforcing an unexecuted parol agreement, made without any consideration, in favor of a party who had himself totally failed to comply with the same, and in his answer swears that, although requested, had continued to refuse to do so, up to the moment of trial. The decree, as will be seen on pages 50 and 51 of the record, undertakes to *adjust* the judgment at law, by a new and independent calculation, to be made by the clerk and master. This was neither prayed for in the bill or answer. The calculation is accurately made by the clerk, according to the data prescribed by the decree, and instead of diminishing the judgment, would have increased it near one thousand dollars. This was a result unexpected to the Court, it is obvious from the latter part of the first paragraph of the decree, in which it is stated that " the balance so found due by the aforesaid calculations, shall be deducted from the aforesaid judgment, and the balance, after such deduction, will be the true amount due by Hunter's estate to Read's estate, and *all the rest of said judgment, except said balance, shall be perpetually enjoined.*"

Now, I respectfully submit that the Court had no authority to attempt to re-adjust this judgment. It was for the true amount, according to the showing of both parties, and the only question was, whether it was against equity and good conscience, under the circumstances, to collect the same. But because the Court committed the error of hearing parol proof to contradict a written contract under

seal, and no such evidence appearing, it seized upon parol proof of a subsequent unexecuted agreement, a *nudum pactum*, and fell into the further error of setting up the same, in lieu of the original valid contract, under which the defendant had himself acted, by suing upon the purchase money notes.

It is plain that this was the point upon which the decision of the Court below turned. For it is manifest that if the judgment at law should have been enjoined, for the causes stated in the bill, namely, the death and insolvency of Read, that the McBride obligation should have also been delivered up. But if Hunter was bound to remove the Bank incumbrance—for that is the whole question—then he had no right to complain that Read had failed to do so, and being dead and insolvent, that damages could not be recovered therefor. That such was not the contract, is plain from all the proof, and is pre-supposed by resorting to parol evidence of the subsequent unexecuted agreement, spoken of by Bembry, the witness.

I have not taken the trouble to examine all the books referred to in the brief on the other side, on the various questions therein mooted. But in no solitary case cited, which I have been able to examine, is there one word militating in any degree against the positions which I have here assumed and quoted from Story. The counsel seem to have fallen into the error of overlooking the facts of the case, and thus raising questions which are not here involved.

I have never seen a case in which it was denied that where a party was remitted to his remedy on his covenants of warranty, by the general rules, that the insolvency of the vendor did not constitute a good reason for enjoining the collection of the purchase money. The thing is too obvious for argument. Cases may sometimes be found where the question of fact—of whether the vendor is so insolvent as to render the remedy on the covenants worthless—has been raised. Such is the case in Mississippi, reported in 5 Smedes & Marshall's Rep. There the injunction was refused because the allegation of insolvency was disproved by the evidence. But this principle was only necessary in this case so far as the covenant of warranty as to the slaves was concerned. For it is said by the Supreme Court of Tennessee, in the case of Buchanan vs. Slade, 8 Hump., 518, 19, " Where the purchaser has taken a deed with covenant of general warranty, under which he has entered and remains in the undistur-

bed possession of the land conveyed to him, if there be no fraud in the transaction, he cannot before eviction, *on the mere ground of defect in title*, claim relief in equity, either against the payment of the purchase money, or to have the contract rescinded, or restitution of the purchase money. In such cases, he must seek his remedy at law, upon the covenant of warranty in his deed," citing 3 Hump., 16.   2 John. Ch. Rep., 519.   13 Ves., 114.

And because we knew this to be law as to the slaves, to which we had a bill of sale with warranty, and the quiet possession, we have not come into equity *on the mere ground of defect of title*, but have shown, beyond dispute, that if we do seek our remedy at law upon the covenant of warranty on the deed, that our search will be fruitless—our remedy will be incomplete and inadequate, because we cannot collect the judgment which may be awarded for breach of the warranty.

The same Court, in the same cause, lay down the doctrine as well established, that where title has not been made to land, the payment of the purchase money may be resisted in equity, upon the ground of mere defect of title.   Immediately after the passage above quoted, the Court proceed to say :   " But it is otherwise where the purchase money has not been paid and the title made. If the purchaser is in possession under a mere equitable title, as a *title bond or covenant to convey*, he has a clear and *well established right in equity to resist the payment of the purchase money*, or to have the contract rescinded and the purchase money advanced refunded to him, on the ground of defect of title in the vendor.   He will not be required to complete the purchase, or to accept a conveyance, unless a title can be made according to his contract," &c., citing 11 John. Rep., 525.   4 Mad. Ch. Rep., 122.   2 Sim., 29.

This doctrine is also fully laid down in Sugden's Law of Vendors, 345, in these words :—" Where an incumbrance is discovered previously to the execution of the conveyance, and payment of the purchase money, the vendor must discharge it, *whether he has or has not agreed to covenant against incumbrances*, before he can compel payment of the purchase money"—citing anon. 2 Free., 106.— Vane vs. Lord Barnard, Gilb. Eq., 6.   Sergeant Maynard's case, 2 Freeman, 1.   1 Vesey, 88.   2 Vesey, 394.   2 Vesey, Junior, 441, and 4 Bro. C. C. Reports, 394.

If it should be said that Hunter had the use of the cultivated part of the land, which the proof shows to have been less than half, there having been nine hundred and forty acres in all, and the use of the negroes, about one-half being capable of labor, and there being twenty in all, from the date of the contract, (2d January, 1840,) until they were sold for Reed's debts by the sheriff, 1st December, 1847, a period of near seven years, for which compensation ought to be given, we have an answer which is deemed very satisfactory.    That answer is, that Read had upwards of thirteen thousand dollars in cash from Hunter for nearly that whole period, as well as the three years which have elapsed since—say nine years.    The simple interest on this sum would amount to about ten thousand dollars—making in all about $23,000 received by Read—a sum equal to about $3,300 per annum.

That we should be in earnest in resisting the payment of the balance claimed of near twenty thousand dollars, under these circumstances, as grievous and unjust in the highest possible degree, cannot, we submit, be a matter of wonder.

If the foregoing view of this subject be correct, we need add nothing in relation to the claim of Hiram Hunter and his sister, Mrs. Carpenter, to the money due from the McBride estate, except that it should be decreed to them, instead of James M. Hunter, the administrator of their guardian, Archibald R. S. Hunter.    But we will simply on this point call the attention of the Court to two important facts in the record, which must be decisive of the question in their favor, whatever may be the result as between the two estates, namely, those of Read and Hunter.

No money was demandable from the McBride estate, on account of the shares of Hiram and Grace of the property sold by the heirs of Hunter, until after the death of both Read and Hunter, or until they came of age and made bills of sale, namely, on the first of January, 1842.    The agreement (page 20) says, " and the said McBride binds himself in the sum of twenty thousand dollars to give, or cause to be given, the before described notes, whenever the parties aforesaid shall make, or cause to be made to him, good and sufficient titles and bills of sale for the before described property."

From this it is plain that Read acquired no right to the price of the shares of Hiram and Grace by any transfer of the obligation to him,

if any such was made ; and if he otherwise would, (which we deny,) for the reasons stated in the argument of my colleague, *there was no obligation as to these shares, until that was created by the act of the parties*—consequently, there was none to transfer.

Another fact is, that both Hiram and Grace were infants when Read got possession of this obligation, and were, therefore, incapable of agreeing to its transfer by their brother for his debts, if they had attempted to do so. They were infants at the death of their guardian. The only evidence on the point is that of James M. Hunter, who states that *he* did not know when the McBride obligation was passed to Read, and that neither Hiram nor Grace knew the fact until long afterwards. See his deposition, pages 35, 36, 37.

I contend, in conclusion, that the decree in this cause should be reversed, and this Court, proceeding to render such decree as the Court below should have done, do now, by decree, perpetually enjoin the enforcement of the judgment *quando* against the administrator of Hunter's estate, and order the judgment, confessed by Mrs. McBride and Robert B. Haughton, to be paid in equal portions to Hiram S. Hunter and to Richard B. Carpenter and wife, and that defendant, Bradford, pay all the cost of this cause.

HAWKINS, J.

We will take up the cases in the order in which they stand.

First. The question raised by the pleadings is this—Is James M. Hunter, the administrator of his brother, Archibald R. S. Hunter, entitled to equitable relief from a Court of Chancery under the circumstances of this case ? It must be borne in mind, that this is not a bill for specific performance or the rescission of the contract. In the first instance, the party asking such specific performance " must show that he has been in no default in not having performed the agreements, and that he has taken all proper steps towards the performance of his part." 2 Story's Equity, 81. Nor does he ask a rescission of the contract, but only asks an injunction against the collection of any further sum due upon the judgment obtained at law against James M. Hunter, administrator, on the promissory notes given by Archibald Hunter in his life time, to Leigh Read. It will be seen by reference to the statement of the case, that these notes were given to secure the payment for the land and negroes purchased by A. R. S. Hunter from Read.

The bill in this case charges, that there are heavy incumbrances upon the land, that is to say, a mortgage executed by Leigh Read, on the 3d September, 1839, to the Union Bank of Florida, to secure one hundred and twenty-seven shares of stock, amounting to $12,700 and $8,468 borrowed money, for which he gave what is usually known as a stock note.

The bill further charges, that the estate of Read is hopelessly insolvent, and alleges that unless relief is had in a Court of equity, he will be remediless, as the resort to the covenants in his bond by action at law, would be futile and nugatory. The supplemental bill further states, that on the 27th of February, 1845, a judgment was obtained against James M. Hunter, administrator, upon these promissory notes for $9,432 34 ; and it is to restrain the collection of this money that the bills are filed.

The answer denies that there is any other incumbrance upon the land sold by Read to Hunter than the mortgage given to secure the one hundred and twenty-seven shares of stock, and as to the insolvency of Read's estate, declares that it " cannot admit or deny it," and cannot say whether the estate is solvent or insolvent, owing to circumstances which are set forth. The answer further asserts that at the time of the sale of Read to Hunter, he, Hunter, had full knowledge of the incumbrances, was bound by this knowledge, and that he must seek his redress at law upon the covenants in his bond for title.

As to the answer of Bradford, in relation to the insolvency, we do not deem it a denial of the charge of insolvency contained in the bill. In Apthorpe vs. Comstock, Hopkins' Chancery Reports, 148, the Court say : " Where a defendant thus states his ignorance of the principal allegations of the bill, and merely asserts that while he is ignorant he does not believe them to be true, such an answer can hardly be deemed a sufficient denial of the facts alleged in the bill to dissolve an injunction issued as a proper auxiliary to the relief sought." The case is like that of Roberts vs. Anderson, 2 John. Ch. R., 204, in which the Court continued an injunction after a similar answer. So, too, Chancellor Kent uses this language : " With respect to the sufficiency of the answer, the general rule is, that to so much of the bill as is material and necessary for the defendant to answer, he must speak directly, without evasion, and not by way of negative pregnant.

He must not answer the charges merely literally, but he must confess or traverse the substance of each charge positively and with certainty, and particular precise charges must be answered particularly and precisely, and not in a general manner, even though a general answer may amount to a full denial of the charges." "Indeed," as Lord Eldon observes, " the policy of the pleadings in this Court is, that a general denial is not enough, but that there must be an answer to the sifting inquiries upon the matter charged. If a fact be charged which is in the defendant's own knowledge, he must answer positively and not to his remembrance or belief, and as to facts not within his knowledge, he must answer as to his information or belief and not to his information or hear say merely, without stating his belief one way or the other." 1 Harr. Ch. R., 302. Mitford, 246, 247. Cooper's Eq. Pl., 313, 314. 1 John. Ch. Rep., 107, Woods vs. Merrell. In Ward vs. Vanbokkelin, 1 Paige R., 100, it is laid down, that an injunction on coming in of the answer, will not be dissolved, unless the defendants deny all the equity of the bill.

Governed by these principles, we must think that the answer of Bradford is not a denial of the allegation in the bill as to the insolvency of Read. Being the administrator of his estate, he could certainly have formed some estimate, some idea as to the solvency or insolvency of the estate. And the facts as to this question being presumed to be peculiarly within his knowledge, his answer should have been explicit, and not being so, must be regarded as an admission of the charge of insolvency. This question, as will be seen, is of importance in the consideration of the case at bar. It is contended that the complainant in this case, is not entitled to relief, because his intestate bought with knowledge of the incumbrance upon the property, took possession of it, and that there has been no eviction and that his remedy must be upon his covenants for title. There can be no doubt as to the correctness of this as a general principle, in cases where a deed has been given and the contract executed. In Abbot vs. Allen, 2 John. Ch. R., 519, it was decided that a purchaser of land who has paid part of the purchase money and gives a bond and mortgage for the residue, and is in the undisturbed possession, will not be relieved against the payment of the bond or proceeding on the mortgage on the mere ground of defect of title, there being no allegation of fraud in the sale, nor any eviction, but must seek his

remedy at law upon the covenants in the deed. This decision is in accordance with the case of N. J. & S. Bumpus vs. Platner, et al., 1 John. Ch. R., 213, and many other cases. Courts draw a distinction as to claims for equitable interposition between contracts *executed* and *executory* contracts, a distinction, we think, founded upon good sense and justice. We will cite some of them, giving the language of the Judges pronouncing the decisions. In the case of Buchanan vs. Slade, 8 Humphreys, 518, the Court say : " Where the purchaser has taken a deed with covenant of general warranty, under which he has entered, and remains in undisturbed possession of the land conveyed to him, if there be no fraud in the transaction, he cannot, before eviction, on the mere ground of defect of title, obtain relief in equity, or have the contract rescinded, or restitution of the purchase money. In such case, he must seek his remedy upon the covenant of warranty in his deed. But it is otherwise when the purchase money has not been paid and title made." If the purchaser is in possession under a mere equitable title, as a title bond, or covenant to convey, he has a clear and well established right in equity to resist the payment of the purchase money, or to have the contract rescinded, and to have the purchase money advanced refunded to him on the ground of defect of title in the vendor. He will not be required to complete the purchase or accept a conveyance, unless a title can be made according to the contract." So, in a case reported in Monroe, 202, it is said " A vendee will not be compelled to accept a conveyance under an executory contract, until the vendor exhibits a regularly deduced title, free from incumbrances, and apparently sufficient to assure the estate according to the contract. But a vendee who has accepted a deed and the possession with a covenant of warranty is presumed to have inspected the evidences of title and to have been satisfied with assurances, and to have received the title papers."

The case at bar is one entirely executory in its character. It is an agreement to convey, and not a conveyance *as to the real estate.* In 5 Wendell, 29, Jackson vs. Moncrief, it is laid down that, although the instrument contains words of present purchase and sale, yet those words must be construed in reference to the whole instrument ; and if further conveyances were to be made, it would be an agreement to convey, and not a conveyance—and until these convey-

ances were made, the agreement was inchoate. The contract in this case being executory, we see no good cause why a Court of Equity should not interfere to restrain the further collection of the purchase money, for which judgment is had at law, when it is very clear that the covenants entered into by the vendor cannot be complied with, although the incumbrance was known by the vendee to exist. Yet if the contract was to the effect that the vendor should make good and lawful rights, the Courts will not compel him to accept a defective title in the teeth of his covenants. If the rule were otherwise, no course would be open to a vendee, who desires to secure himself against known defects. Jackson vs. Ligon, 3 Leigh, 161. 3d Munford, 68. And further, that, although the day of payment may have arrived, a vendee is not bound to part with the purchase money, unless a title is made or tendered, according to the terms of the contract. 4 Mun., 12.

·The first of these propositions is certainly not in accordance with the more rigid rules of the English Courts, in·which it is held that possession by the vendee is equivalent to a waiver of any objection to any incumbrance which may exist; but without positively adopting the rules of the Virginia cases, we must say they are based on justice and propriety. A person entering into an agreement for a purchase of land, knowing of an incumbrance, feels assured, that when he takes a bond from the vendor to make him a perfect title, on the payment of the purchase money, that he will be protected, in the language of Judge Tucker, "against known, as well as unknown incumbrances." Jackson vs. Ligon, case before cited.

But resting the case upon the principle that the party in the present instance must seek his redress at law, upon the covenants in his bond—is that redress adequate, or complete ? The record, on the contrary, shows that, owing to the insolvency of the estate of Read, no redress whatever could be effected by a suit upon the title bond; besides, supposing that the administrator of Hunter was now to pay the balance of the purchase money to the estate of Read, why compel him to seek his redress at law, and put him to this circuity of action, where a Court of competent powers can give him direct redress, should he present a proper case.

In relation to the question, whether the insolvency of the vendor is a good ground for an appeal to the equity side of the Court, we

quote the following language used by the Court in the case of Vance vs. House's heirs, 7 Munroe, 541 ; and while we give the quotation our decided approbation, it will be observed that it was in case of an executed, and not executory contract. " But passing from this preliminary suggestion, we would proceed to remark upon the merits of the controversy, that this is the case of an executed contract, where the conveyance has been made and accepted, with warranty of title, and possession delivered and uninterruptedly enjoyed, without eviction, or molestation. In such a case, a bill for the dissolution of the contract cannot be sustained, and the payment of the consideration enjoined, except in case of fraud, *insolvency*, or non-residency of the vendor, and a palpable and threatening danger of immediate or ultimate loss, without legal remedy, by reason of the defects of the title conveyed, and the inability of the vendee to protect himself against eviction under it. And to sustain such a bill, after the vendee has accepted the conveyance, the *onus* lies upon him to establish, to the satisfaction of the Chancellor, that the defect of title and imminent danger of eviction and loss exists."

There had been an injunction granted in this case, but the bill was dismissed, because it contained no allegation of fraud, insolvency, or non-residency. In Morrison's administrator, vs. Beckwith, 4 Munroe, an injunction was granted, upon showing the insolvency of the vendor. Heironymous vs. Hicks, 3 J. J. Marshall, 701. 6 Munroe, 232. 1 Dana, 305.

In the case of Vick vs. Percy, et al., 7 Smedes & Marshall, the Court hold the principle as laid down by Chancellor Kent, in the case of Abbott vs. Allen, 2 John. Ch. R., 519, but it remarks, " that the only two grounds alleged for the interposition of equity are *fraud* and insolvency of the defendant. These are denied by the answer, and there is no proof to establish either. The complainant being in possession, under a deed with warranty, with no fraud made manifest, and with nothing to show that the covenanter is not able to pay any damages that may be recovered against him, has no right to call his vendor into a Court of Equity to litigate an adverse title—he must rely on his covenants, if he should be evicted." This Court here virtually admits that insolvency would be a cause for equitable interference. In Hunter vs. O'Neil, 12 Ala. Rep., 37, the Court lays down the following propositions: " An obligation to make a deed to

37

certain lands, when the price contracted for is paid, is in law a cove-
nant to make a good title, when the condition is performed by the
purchaser. When the vendor entering into such a contract, becomes
insolvent before the price is paid, and the purchaser shows an out-
standing incumbrance created by the vendor, he will be entitled to
relief in a Court of Equity. But unless the money is actually ten-
dered, upon condition that a title is made, the only relief is to enjoin
the vendor from proceeding for the price, until he gives indemnity
against the outstanding incumbrance."

After these adjudications, we are clearly of opinion that the insol-
vency of the vendor is good ground for equitable interposition, upon
the principle that Chancery will lend its aid, whenever there is not a
full, complete, or adequate remedy at law. As to the personal prop-
erty sold by Read to Hunter, it requires no argument or authority to
show that an implied warranty as to title followed the sale, though
the record shows there was an absolute warranty.

It is urged that Hunter was bound to tender the money due upon
the purchase, and if he had, the incumbrance would have been re-
moved—but is this a *sequitur?* The amount due upon the contract
would not have been sufficient to have removed the incumbrance,
and what guarantee would the vendee have had that it would have
been so applied? Again : Why tender the balance of the purchase
money, if it was clearly ascertained and settled that the vendor could
not give a title in accordance with his bond? In the language of the
Court, in Fisher vs. Bridges, 4 Blackford, 518, " the utter inability
of the defendant to convey, dispensed with the necessity of the de-
mand, as the law does not require a vain or nugatory thing to be
done."

It is contended by counsel for defendant, that Hunter agreed to pay
the stock note of Read, and Read was to transfer the Union Bank
stock to Hunter. By reference to the record, we cannot perceive
that any such arrangement was positively entered into. There was
a negociation pending, no doubt, as to this subject, but it seems never
to have been carried into operation, owing to the several deaths of
Read and Hunter, and was altogether of an inchoate nature.

Bembry says : " They had agreed to come to a settlement, which
was prevented by the sudden death of Read." In his second exam-
ination, he says : " Archibald has told me that he and Read were

to have a settlement, and that there would be a small difference between them, but in whose favor he did not know." A Court could not consistently enforce an imperfect and incomplete verbal agreement between parties, at variance with the solemn obligations in writing, and when there is no evidence to show that it was executed in part or in whole by either of the parties.

Before closing this branch of the subject, it will be seen, by reference to the evidence, that the land sold by Read to Hunter, and the negroes, except one or two, were sold under an execution against the estate of Read, in favor of the Union Bank, to satisfy Read's stock note. This having occurred since filing the bill by complainant, no mention is made of it; but by looking at page 50 of record, we see an agreement in these words: "It is agreed by the parties by their solicitors, that the property sold by the execution of the Union Bank vs. Read's administrator, brought $5,079, $4,754 of which was recovered by the Bank, in full satisfaction of their execution against Read's estate, and of their lien upon the property sold by Read to Hunter."

Although as a general rule, evidence is inadmissible, unless relating to the issues made up in the pleadings—still, the evidence as to the fact of sale being before the Court by consent of counsel, we feel authorized to advert to it. The sale in this case brings the suit substantially within the rule laid down in Abbott vs. Allen.

Here was a judgment at law—execution and property sold—a sheriff's deed, no doubt, given, under which possession could have been enforced at law, unless the party in possession submitted, and covenanted to give up possession. It would have been idle and futile for complainant to have litigated further as to the land, and we see, in 3d J. J. Marshall's Reports, 378, it is not the duty of a party so situated to do so. The Court say: "If the party submits to the judgment, it is equal to an actual eviction by the *habere facias*. No other evidence of a legal eviction is required than the judgment of the Court."

Upon a review of the facts of the case, it would be, we deem, extremely hard and inequitable that there should be a further collection of the purchase money against the estate of Hunter. It has expended upwards of thirteen thousand dollars, and does not seek by the present proceeding a recovery of any part of this sum against the estate of Read—the property for which this amount was paid—and

other liabilities incurred, has been sold under execution against the estate of Read, and goes to pay its debts. There may have been *laches* on the part of the estate of Hunter, no doubt, in not offering to complete the sale, though as we have seen, it would have been a mere form, owing to the insolvency of Read's estate.

The estate of Read, on the other hand, was bound to remove the incumbrance on the property sold, by the first day of January, 1843, which it did not do, and was equally, if not more in fault, than the estate of Hunter. The loss sustained by the latter estate is far greater than that sustained by Read's, and we are disposed to let the parties remain where they now are.

It is therefore, ordered, adjudged and decreed, that the decree rendered in the Court below, be reversed, and that the injunction heretofore granted in this case be made perpetual.