DAVID SOMMERS, WM. R. HAUZE, CHAS. B. DUFFY, J H. TRUMP AND B. H. BEVERLY, *Appellants* v. APALACHI-COLA NORTHERN RAILROAD COMPANY, ILLINOIS STATE TRUST COMPANY, THE FLORIDA COMPANY, SAINT JOSEPH LAND & DEVELOPMENT COMPANY, EDWARDS WHITTAKER, H. BLAKSLEY COLLINS, J. C. VAN RIPER, XENOPHAN P. WILFLEY, R. H. HEMPHILL, E. A. FAULHABER, PINE FOREST LAND COMPANY, MOREY ENGINEERING & CON-STRUCTION COMPANY AND THE UNKNOWN HOLDERS OF THE MORTGAGE BONDS OF THE FLORIDA COMPANY, *Appellees.*

Opinion filed January 31, 1918.

1. A bill in chancery which seeks an accounting from the agents of the complainants of money spent, profits made and obligations incurred, and other appropriate relief, upon the alleged grounds that the agents practiced fraud upon their principals in the business which they were employed to transact, such frauds consisting in engaging in transactions beyond the scope of their employment as such agents; wasteful and dishonest expenditure of funds handled by them for their principal; participating in fraudulent contracts with persons and corporations with whom they were associated in business in order to defraud their principals; and bad faith and corrupt practices from the inception of their employment, with the

end in view of securing the profits for themselves which the business in hand might have produced for their principals, is not subject to demurrer as being without equity.

2. Equity will lend its aid where there is not a complete and adequate remedy at law.

3. A court of chancery having jurisdiction for one purpose will retain the bill as to all other matters germain and necessary to the attainment of justice between the parties.

4. Where it is not clear that the remedy at law is full and adequate equity will entertain jurisdiction in a cause between principal and agent to compel an accounting and for other appropriate relief where the relations between the parties involve complicated accounts and fraudulent practices by one to benefit himself at the expense of the other.

Appeal from Circuit Court for Franklin County, C. L. Wilson, Judge.

Order reversed.

Y. L. Watson and W. C. Marshall, for Appellants;

W. J. Oven and George H. Williams, for Appellees.

PER CURIAM—The appellants who were complainants below exhibited their bill in equity in the Circuit Court for Franklin County against the appellees who were defendants below.

The bill which is very lengthy purports to contain the history and details of a very elaborate and complicated but fraudulent scheme on the part of certain persons named as defendants to defraud the complainants as stockholders of the Apalachicola Northern Railroad Company and the Saint Joseph Land & Development Com-

pany which are named as defendants, by assuming to exercise powers not resting upon them either by contract with the complainants or the corporations nor as officers or stockholders of the two corporations; by dishonest financial operations; wasteful expenditure of moneys held by them in a fiduciary capacity and fraudulent operations under a contract with a Construction Company named in the bill as one of the defendants, which the same persons named as defendants controlled and in which they were financially interested.

According to the bill of complaint the scheme was originated and is being carried out by Edwards Whittaker and H. Blaksley Collins who were associated in business in St. Louis, Missouri, as Edwards Whittaker and Company; J. C. Van Riper, President of the Illinois State Trust Company and R. H. Hemphill of St. Louis, Missouri, who had for their object the ultimate ownership of all the stock owned by the complainants in the Railway and Land Companies which are named as defendants; the control of those corporations by acquiring through fraudulent means the stock therein and the bonds issued by them thus placing themselves in control of the franchises and properties of the two corporations which were alleged to be of the value of several million dollars.

It is alleged that in this fraudulent scheme the above named persons were assisted by certain other individuals among whom was the defendant Xenophan P. Wilfley.

The bill is too lengthy to be quoted in full especially as little benefit would be gained by so doing. We will undertake however to state the substance of its allegations.

The complainants and Hemphill were on the 10th and 11th days of May, 1905, and for a time prior thereto the owners of all the stock of the Apalachicola Northern Rail-

road Company, a Florida corporation, which stock amounted at that time to $500,000.00 which was the amount of its legally authorized capital stock.    Ten percent. of the capital stock had been paid in.    They were also the owners of all the stock of the Saint Joseph Land & Development Company, a Florida corporation, the authorized capital stock of which is not given.    The railroad corporation was organized to .construct a railroad and operate it from River Junction, Florida, to St. Joseph Bay on the Gulf in this State.

That the complainants and Hemphill had acquired a right of way for the railroad between the two points; lands for turn-outs, switches, yards and depots; had graded four miles of railroad bed and spent six thousand dollars therefor and had acquired from the State of Florida a land grant of five thousand acres per mile. That they had also acquired an option on over a hundred and ninety thousand acres of land and seven thousand acres of land with seven miles of water front at St. Joseph's Bay.

The complainants desired to obtain funds with which to complete the road and make sufficient payments upon the lands to secure them.    They needed a million and a half dollars and applied to the defendants Whittaker & Company and Van Riper to procure the loan which was to be secured by a mortgage on all of the property of the Railroad Company and of the Land Company. Whittaker & Company and Van Riper agreed to negotiate the loan for complainants and to that end two contracts were entered into on May 10th, 1905.

One contract was between Duffy, Hemphill, Hauze and Sommers on the one side and Whittaker & Company and Van Riper on the other.    Sommers being described in the contract by mistake as being associated with Whit-

taker and Van Riper instead of with Duffy, Hemphill and Hauze.

This contract recited that Duffy and others desired to obtain a million dollars to construct and equip the railroad for operation, the stock of which company they owned and controlled; that Whittaker and Van Riper were ready, willing and able to obtain the sum desired by using the stocks, bonds and other securities of the road "in the manner set forth in another and separate agreement dated the .... day of May, 1905" and that as payment for obtaining the million dollars it was "agreed that Whittaker & Company should have one-twelfth (1-12), J. C. Van Riper one-twelfth (1-12) and Sommers two-twelfths (2-12) of said Railroad Company." The remaining eight-twelfths (8-12) were to be distributed between Hauze, Hemphill, Duffy, Trump and Beverly. All the stock was to be pledged as security for the payment of the indebtedness and the stock should be pooled and voted for a period of five years according to the terms of the "said other agreement dated .. May, 1905." The second agreement dated May 10, 1905, was between the same parties, Sommers by mistake being described as of the second part instead of one of the parties of the first part. This agreement also recited that all of the parties were interested in the construction, equipment and operation of the railroad and that the parties of the first part had commenced the formation of a corporation to be known as The St. Josephs Land & Development Company to handle the lands and properties which they had acquired; that Whittaker and Van Riper had furnished $500,000.00 to be used in the purchase of the lands, options upon which had been secured as stated and that as consideration for what Whittaker and Van Riper had done they were to receive each one-seventh (1-7) of the capital

stock of the corporation.    The remaining five-sevenths
(5-7) were to be distributed between Hemphill, Hauze,
Sommers and Duffy.    It was also agreed, as in the first
agreement, that all of the capital stock should be pledged
as collateral security for the payment of the "indebtedness
mentioned in a certain agreement dated the .. day of
May, 1905 and that it should be held in a pool and voted
for a period of five years" according to the terms of the
said agreement.

It is further alleged that Whittaker and Van Riper
instead of causing bonds of the Railroad and Land Com-
panies to be issued and secured by a mortgage upon the
properties of the said companies as a means for raising
the money desired, they "caused Chas. B. Duffy to enter
into a contract with them dated the 11th day of May,
1905."    A copy of this contract as well as copies of the
two before referred to are attached to the bill as exhibits
A, B and C.    The bill alleges that this contract of May
the 11th constituted part of the scheme to injure and
defraud the complainants.    That contract was entered
into between Chas. B. Duffy of the first part and Whit-
taker & Company and J. C. Van Riper, parties of the
second part.    It recited that Duffy owned all the capital
stock of the Railroad Company which amounted, accord-
ing to the contract, to $2,000,000.00 and that he owned
all the capital stock of the Land Company which the con-
tract recited amounted to $1,000,000.00 and that Duffy
desired to borrow a million and a half dollars for the
purpose of building the railroad and paying for the lands.
It was agreed on the part of Duffy that he was to organize
a corporation to be a Holding Company and that the
company when organized should become the owner of all
the stocks and bonds of the Railroad Company and the
Land Company and that the Holding Company should

pledge such stocks and bonds as collateral security for the repayment of the $1,500,000.00 on or before three years after date with five percent. interest; that the stock of the Railroad and Land Companies should be pooled for five years, be controlled by four trustees to be selected by Duffy and Whittaker and Van Riper. There should be seven directors in each of the companies, three of whom to be selected by Duffy's trustees, three by Whittaker and Van Riper's trustees and the seventh by the Illinois State Trust Company who was to be the trustee in both pooling agreements; that the Holding Company which was to be known as The Florida Company should have seven directors selected in the same manner; that the contract for building and equipping the railroad should be let to the Morey Engineering & Construction Company at cost and ten per cent. profit. This contract, according to the allegations of the bill, contained many provisions relating to the evidences of indebtedness which were to be issued by The Florida Company and the security therefor. Some reference is made to a collateral agreement and collateral notes which were to be in such form as designated by Whittaker and Van Riper; that the money derived from the notes was to be used to pay for the lands of the Land Company and the office expenses of the Railroad Company during construction; that the title to all the lands at St. Joseph's Bay which was then in Sommers should be conveyed to the Land Company and that all contracts for lands should also pass to the Company. It was provided that the entire bond issue of the Railroad Company should "not be less than eighty-five per cent. of their par value;" that certain lands might be sold at the price fixed; that during each year the pooling agreement remained in force the President of each of the three companies should be named by the trustees selected by Duffy,

the Treasurers should be selected by the trustees named by Whittaker and Van Riper; that all moneys derived from the sale of lands, timber, turpentine rights, the operation of the railroad or from any source should be paid to the Illinois State Trust Company as Trustee and at an agreed time should be used in the payment of the indebtedness.    It was further provided by this agreement that Whittaker and Van Riper should receive for their services in disposing of  the notes · or .bonds to be . issued by the holding company the sum of $750,000.00 to be paid in three years and the collateral securities of the holding company were to be held in trust for the payment of that sum of money as well as for the payment of the $1,500,000.00 in bonds; that when the indebtedness should be paid the securities held by the trust company should be returned to The Florida or Holding Company.    On the part of Whittaker and Van Riper it was agreed that if they were satisfied with the regularity of the proceedings in the matter of the organization of the corporations and were satisfied with the title to the lands as well as the value of the same they would "negotiate said notes or bonds and obtain $1,500,000.00 as aforesaid and agreed to advance the sum of $250,000.00 of this amount to be used in exercising the option  of  purchase" on certain lands.    The bill alleges that these three agreements were prepared by the defendant Wilfley as attorney for Whittaker and Van Riper and  that  he also  organized The Florida Company in Maine and prepared all  the documents, forms, stocks, bonds and notes used in the transaction under the direction and control of Whittaker and Van Riper.    It is then alleged that the defendants Whittaker and Van Riper having secured the agreement with Duffy of May  the 11th,  above  referred  to, which it is alleged was part of the scheme to defraud the complain-

ants, proceeded unlawfully and without authority to increase the capital stock of the railroad; that they caused it to issue $2,000,000.00 of bonds which were secured by a mortgage on all its properties, caused the Land Company to issue $2,000,000.00 of bonds secured by mortgage on all its properties and then transferred its bonds to the Illinois State Trust Company and have not up to this time sold or negotiated any of them.    At the same time and without any legal authority they issued certificates for $3,000,000.00 of stock of the Railroad Company and $2,000,000.00 of stock of the Land Company in the name of Duffy and caused the same to be endorsed by him in blank and were by Whittaker and Van Riper delivered to the Illinois State Trust Company which holds the same; that the issuing of such bonds and stocks was never authorized by the complainants nor acquiesced in, consented to or ratified by them and that no money whatever was ever paid either to the Land Company or to the Railroad Company for any of such certificates of stock or bonds; that as a part of the scheme to cheat and defraud the complainants Whittaker and Van Riper then caused The Florida Company to issue 1,500 bonds of the denomination of $1,000.00 each and 1,500 non-interest-bearing bonds of the denomination of $300.00 each all to mature in three years; that they caused The Florida Company then to execute a mortgage to secure the payment of said bonds which aggregated $1,950,000.00 which mortgage was based solely on the stocks and bonds of the Railroad and Land Companies above mentioned and which were on deposit with the Illinois State Trust Company as trustee.    In addition to the above issue of bonds of $1,-950,000.00 Whittaker and Van Riper without any authority caused The Florida Company to issue $300,000.00 more of bonds which were also secured by mortgage upon

the same stock and bonds for the Railroad and Land Companies held by the Illinois State Trust Company.

The bonds of The Florida Company, so illegally and unlawfully issued as stated, were, so the bill alleges, made payable in three years whereas the bonds of the Railroad and Land Company were payable in twenty years it being intended and designed by Whittaker and Van Riper not to complete the railroad within three years so that it could not be earning money enough to pay off and discharge the indebtedness and that the Land Company should be so mismanaged that it would not yield enough revenue from the sale of lands and turpentine to pay off its indebtedness and that upon the maturity of the bonds issued by The Florida Company the mortgage would be foreclosed, the stocks and bonds sold and the complainants thus deprived of all their rights and interests in both companies.

The bill alleges this to be the purpose of the defendants Whittaker and Van Riper. It then recites in detail the steps taken by these defendants to accomplish that purpose. It alleges that as soon as these arrangements were made Whittaker and Van Riper assumed control of the affairs of the Railroad and Land Company; that they caused a contract to be entered into between the Railroad Company and the Morey Engineering & Construction Company which, it is alleged, they owned and controlled, for the construction of the railroad and that they caused this Company to begin work on the railroad before the mortgage given by the railroad to secure its bonds was placed upon record. This was done, so it is alleged, with the fraudulent purpose of giving the Construction Company a lien upon the railroad properties prior to the lien of the bond holders of that company. That Whittaker and Van Riper did not advance

the $250,000.00 which the contract made on May the 11th provided they should furnish and that they had received $1,500,000.00 for the sale of the 1,500 five per cent. bonds issued by The Florida Company, out of which they had paid $425,000.00 on account of the purchase of lands and that they had in their control the remainder of the proceeds of the bonds amounting to $1,075,000.00 with which to construct railroads; that instead of using the money for that purpose they, pursuant to their scheme to defraud the complainants, mis-managed the affairs of the railroad through the Morey Engineering & Construction Company, squandered the money in needless and unnecessary expenses and by fraudulent claims pretended that the total cost of building the eighty miles of railroad amounted to $1,618,321.00 of which only about $790,000.00 had been paid and that there remained due to the Morey Engineering & Construction Company a balance of $820,000.00 approximately. These claims, representations and pretenses of Whittaker and Van Riper are alleged to be fraudulent and made for the purpose of defrauding the complainants and pursuant to the scheme to acquire the ultimate ownership of the stock owned by the complainants in the Railroad and Land Company, to secure control of the corporations and thus acquire valuable properties greatly in excess of the $1,500,000.00 indebtedness of the two companies and deprive the complainants of all equity or beneficial interest therein. That as a part of this fraudulent scheme the defendants Whittaker and Van Riper refused to make any sale of turpentine rights although at one time they had an opportunity to realize over $1,000,000.00 for turpentine rights from the lands upon which the complainants had secured option; that the refusal to sell

these turpentine rights resulted in rendering the companies unable to meet the obligations' of The Florida Company when the latter became due; that Whittaker and Van Riper then procured the Morey Engineering & Construction Company in July, 1907, when the road was completed to institute procedings in the Circuit Court for Franklin County to enforce a lien against the railroad for the alleged balance due for constructing the same; that Whittaker and Van Riper employed the counsel for that company as well as for the Railroad Company and the Illinois State Trust Company and that the suit was a collusion wholly controlled by Whittaker and Van Riper, based upon a pretended balance due for the construction of the railroad, which balance did not exist in fact and for the purpose of swindling and defrauding the complainants; that pursuant to the scheme and by fraud practiced on the Court they secured the appointment of Faulhaber as a receiver for the Railroad Company. In the meantime Whittaker and Van Riper represented to complainants that in obtaining the receiver they merely desired to preserve the status of all the companies during the then financial stringency of the money market while they were in fact secretly engaged in an attempt to impose upon the Court and obtain a decree by consent in favor of the Morey Engineering & Construction Company against the defendants in the suit.

It is also alleged that in the Fall of 1907 Whittaker and Van Riper caused The Florida Company to notify the Illinois State Trust Company that there were no funds in The Florida Company with which to pay interest upon the coupons on the bonds issued by The Florida Company which coupons were due in September of that year; that the railroad had been completed to River

Junction at a cost of $1,600,000.00; that the lands at St. Joseph's Bay had been fully paid for and that part of the purchase price of the timber lands had been paid and there was still an indebtedness on account of the purchase of the lands and on account of the balance due to the Morey Engineering & Construction Company which had a lien upon the property of the railroad; that the resources of the company amounted to a total of $4,850,000.00 and that the liabilities of the company amounted to $3,590,000.00, leaving a balance in resources over liabilities of $1,259,500.00; that Whittaker and Van Riper pursuing their original scheme to defraud the complainants proposed to form a new company which was to become the purchaser of all the securities held by the Illinois State Trust Company for The Florida Company at a foreclosure sale of the mortgage made by the latter company. This new company was to issue $4,000,000.00 of common stock, $1,000,000.00 of preferred stock. $2,000,000.00 of ten year bonds and $1,500,000.00 six per cent ten year bonds, making a total stock and bond issue of $8,500,000.00. This stock and bonds of the new company were to be distributed between the holders of the first $1,500,000.00 of The Florida Company's bonds and the $450,000.00 non-interest-bearing bonds and the holders of the $300,000.00 second mortgage bonds and the remainder, not so distributed, was to be sold and that which was not sold to be placed in the treasury. The distribution of bonds and stock in the new company thus to be formed was to be made, so the bill alleges, in such maner as that Whittaker and Van Riper should receive $750,000.00 of preferred stock and $225,000.00 of common stock in the new company for the $750,000.00 of the Florida Company's bonds which they took as compensation for negotiating the

original loan of $1,500,000.00 on the stocks and bonds of the Railroad and Land Company; that the holders of the $1,500,000.00 Florida Company's bonds should receive a like amount in common stock and a like amount in second mortgage bonds, or $3,000,000.00 in place of their $1,500,000.00 investment. Two million of first mortgage bonds; two million dollars of common stock and two hundred and fifty thousand dollars of preferred stock to remain in the treasury, and two hundred and seventy-five thousand dollars of common stock to be sold. This arrangement so the bill alleges would place Whittaker and Van Riper and the holders of the Florida Company's $1,500,000.00 five per cent bonds in control of the new company and thus "freeze out all the stockholders" of the railroad and land companies.

The bill contains allegations to the effect that Whittaker and Van Riper, pursuant to their scheme to defraud the complainants of all their interests in the railroad and land companies and the properties and equities therein which they had secured, intentionally mismanaged the affairs of the two companies, squandered and wasted the moneys in their hands to be used in the interests of the two companies, had refused to pay the balance due on the lands, had supported the fraudulent claims of the Morey Engineering Company which the defendants owned and controlled and that their every act was part of the original scheme to defraud the complainants which they originated at the very outset of the transaction when the complainant applied to them to procure a loan of $1,500,000.00. It is also alleged that the railroad and land companies are officered, managed and controlled by the defendants and that the complainants have been denied all right to participate in the affairs of the companies, and ousted of their rights to

properties which they had originally acquired for the land company but they had nevertheless made written demands upon the railroad and land companies and upon Faulhaber as receiver of the railroad company to bring such suits as might be necessary in the interest of the two companies to relieve them of the entanglements in which they had become involved by the fraud and mismanagement of the defendants, but that such request had been denied.

The bill prays that the three contracts referred to be canceled; that the bonds and mortgages of the railroad and land companies be declared a cloud upon the lands and properties of the companies; that the Illinois State Trust Company be ordered to deliver the bonds and mortgages and stocks of the railroad and land companies to the said companies respectively, and that the legally owned stocks be ordered issued to the stockholders of the companies in proportion to their interest therein set out except that Whittaker and Van Riper be divested of all interest because of their fraudulent practices; that the first and second mortgage bonds of The Florida Company be declared null and void; that the Pine Forest Land Company be enjoined from foreclosing a certain mortgage; that the amount found to be due the Pine Forest Land Company be adjudged to be a lien upon the lands and properties of the St. Joseph Land & Development Company; that all proceedings in the case of the Morey Engineering & Construction Company against the Railroad Company be stayed and enjoined forever and that an accounting be taken as to what is due the Morey Engineering & Construction Company and that amount be adjudged to be a lien upon the properties of the Railroad Company but subject to the lien existing in favor of the owners of the original $1,500,000.00 of first mort-

gage interest bearing bonds issued by The Florida Company; that Faulhaber be removed as receiver; that an accounting be taken of the proceeds of the sale of The Florida Company's first mortgage interest bearing bonds and how much thereof has been used for the payment of lands and properties of the St. Joseph Land & Development Company and how much has been used in the construction of the railroad and that so much as may be found to have been spent in behalf of those two companies be adjudged to be liens upon their properties respectively; that an accounting be taken with the Morey Engineering & Construction Company and Whittaker and Van Riper as to what was a reasonable cost for the construction of the railroad and that a judgment be rendered in favor of the Railroad Company against the Morey Engineering & Construction Company and against Whittaker and Van Riper for the difference paid for reasonable cost of such construction and the amount actually paid to the Engineering Company, and for other and general relief.

Demurrers to this bill were interposed by The Morey Engineering & Construction Company, by Edwards Whitaker, by E. A. Faulhaber, St. Joseph Land & Development Company, Xenophon Wilfley and R. H. Hemphill upon the grounds that there was no equity in the bill; that the complainants had no interest in the subject matter set forth; that the defendants were not necessary parties; that the bill was multifarious; that the complainants were barred by laches and that they were estopped by their own acts from setting up the matters contained in the bill and that they had failed to state any facts which were essential to entitle them to relief prayed; that the bill was deficient in certainty and for other good causes, and that so far as the Morey Engi-

neering & Construction Company was concerned that the
bill showed that the matters and things set forth in the
bill were *res adjudicata* in that the same questions had
been settled and decided in a suit pending in the Circuit
Court of the Second Judical Circuit of the State wherein
the Morey Engineering Company was plaintiff and the
Illinois Trust Company, The Florida Company and the
Railroad and Land Companies were defendants. These
demurrers were sustained by the Judge of the Four-
teenth Judicial Circuit acting in place of the Judge of
the Second Judicial Circuit who was disqualified, and
from the interlocutory order sustaining the demurrers
the complainants appeal.

We think that this order should be reversed because
the bill does contain equity and we think that the
complainants were neither estopped nor barred by laches
from seeking appropriate relief; that the bill is not
multifarious as to either one of the defendants and that
each one of the defendants is a proper if not a necessary
part.

The bill is framed upon the theory that the complain-
ants have been unfairly dealt with by their agents whom
they employed to negotiate for them a loan of
$1,500,000.00 which was to be secured by a mortgage
upon properties valued at several million dollars. That
by fraud which consisted of bad faith, the usurpation of
authority, exercising powers beyond the scope of their
agency, ignoring the laws of the land, fraudulent issuing
of certificates of stock of the railroad and land com-
panies, wasteful and dishonest expenditure of funds held
by them in a fiduciary capacity, participating with a con-
struction company to defraud their principals to the
end that they might personally reap the benefits there-
from, false promises of financial aid made to secure con-

fidence and to be broken at an opportune time, excessive charges for compensation and bad faith, corrupt practice and dishonest methods from the inception of the original agreement during every step taken by them under their pretended authority to the present time, the defendants Whittaker and Company and Van Riper and those associated with them, as assistants have cheated and defrauded their employers under the guise of financial operations.

According to the bill the defendants saw an opportunity to acquire by dishonest methods and a small risk of money, a large and valuable property which belonged to the complainants and by abusing the confidence of those who employed them proceeded in the manner stated to take for themselves the profits which should have gone to their employers.

The defendants Whittaker and Company and Van Riper, according to the bill, undertook for a stated compensation to be paid by their employers, to procure a loan for them of $1,500,000.00 which was to be secured by a pledge of the stocks and bonds of the railroad and land companies whose properties after the judicious expenditure of the money would be reasonably worth approximately sixteen million dollars, against which would be the indebtedness of $1,500,000.00 plus the contingent and extraordinary expenses that might be incurred in developing the properties of the two companies. For this service the defendants were to receive two-twelfths of the railroad company and two-sevenths of the capital stock of the land company. But the defendants not acting in good faith did not carry out their agreement, but by the practice of fraud upon the complainants in the manner stated secured for themselves and those whom they associated with them the control

and practical ownership of all the properties of the railroad and land company by acquiring the controlling interest in a corporation to which passed the ownership of all the stocks and bonds of the two companies.

This alleged fraudulent conduct on the part of the defendants Whittaker and Company and Van Riper and their agents and associates we think entitles the complainants in equity to an accounting from those defendants of the moneys properly expended and the profits received by them through and by their various operations and connections in this behalf; to the cancellation of the stocks and bonds of the railroad and land companies which the defendants without authority of law issued to Duffy and deposited with the Illinois Trust Company, and to such other relief as the nature of the case may require to the end that the complainants may without injury to innocent purchasers for value be placed in the situation they occupied upon the issue of the first $1,500,000.00 indebtedness upon the lawfully issued stock and bonds of the railroad and land companies.

Equity will lend its aid where there is not a full, complete or adequate remedy at law. See Hunter v. Bradford, 3 Fla. 269; Gordon v. Simonton, 10 Fla. 179; Broome v. Alston, 8 Fla. 307; Carter v. Bennett, 6 Fla. 214.

It is settled in this State that a court of chancery having jurisdiction for one purpose will retain the bill as to all other matters necessary to the attainment of justice between the parties and arising out of the subject-matters. See Carter v. Bennett, *supra;* Farrell v. Forrest Investment Co., 73 Fla. 191, 74 South Rep. 216; Capital City Bank v. Hilson, 64 Fla. 206, 60 South. Rep. 189; Carlton v. Hilliard, 64 Fla. 228, 60 South. Rep. 220.

Even if a court of law would entertain jurisdiction to

12—Vol. 75

compel the payment of damages by defendants for a breach of their contract, nevertheless as the relations between complainants and defendants involve complicated accounts, and it is not clear that the remedy at law is full and adequate, equity will entertain jurisdiction. See Craft v. Craft, 74 Fla. 262, 76 South. Rep. 772.

There is nothing in the bill to show that the complainants were guilty of laches, or that they are estopped from pursuing the relief sought by this bill, nor is the defense of *res adjudicata* available to the Morey Engineering Company. The complainants were not parties to the suit instituted by that company in the Circuit Court for Franklin County against the railroad company and others and are not bound by the orders therein. See Yullee v. Canova, 11 Fla. 9; Virginia-Carolina Chemical Co. v. Fisher, 58 Fla. 377, 50 South. Rep. 504; Bell v. Niles, 61 Fla. 114, 55 South. Rep. 392. Nor do we think the bill is multifarious. Farrell v. Forrest Investment Co., *supra.*

The interlocutory order of February 5th, 1916, sustaining the demurrers to the bill of complaint is reversed.

TAYLOR, WHITFIELD, ELLIS AND WEST, J. J., concur.

BROWNE, C. J., concurs in the reversal.

BROWNE, C. J., concurring.—I fully concur in the judgment pronounced by the court in this case, but as we have reached the same conclusion by a different process of reasoning I prefer to state my views and theory in a separate opinion.

This cause comes here on appeal from the decree and judgment of the Circuit Court for Franklin County, sus-

taining the demurrers to the complainants' bill in equity brought by David Sommers, W. R. Hauze, Charles B. Duffy, J. H. Trump and B. H. Beverly, *bona fide* stockholders of the Apalachicola Northern Railroad Company and of the St. Joseph Land and Development Company, because the officers of these corporations would not sue, for the following purposes:

"1.  To declare null and cancel  two  contracts dated May 10th, 1905, between Charles  B. Duffy,  Robert H. Hemphill and William R. Hauze, parties of the first part, and Whittaker & Co., J. C. Van Riper and David Sommers, parties of the second part.

2.  To declare null and cancel a contract  dated May 11th, 1905, between Charles B. Duffy, party of the first part, and Whittaker & Co. and J. C. Van Riper, party of the second part, as a cloud upon the title of property of the railroad.

3.  To declare null and cancel an  issue of $3,000,000 stock and $2,000,000 bonds of the said railroad company, secured by a mortgage, as a cloud upon  the title of the property of the railroad company.

4.  To declare null and cancel an issue of $2,000,000 stock and $2,000,000 bonds of said land company secured by a mortgage, as a cloud upon the title of the property of the Land Company.

5.  To declare null and cancel  an issue  of $1,500,000 bonds of the Florida Company.

6.  To declare null and foreclose the mortgage of the Florida Company to secure the $1,500,000 bonds of that company and to declare the purchasers at such foreclosure sale trustees for the benefit  of the creditors  and stockholders of the Railroad and Land Companies.

7.  To require an accounting by Whittaker & Co. and Van Riper of the trust funds that came into their posses-

sion for the construction of the railroad and for the purchase of 192,310 acres of pine lands, and an accounting by the Morey Engineering & Construction Company of the amount received by it for the construction of the Railroad, and to charge all of said parties for the difference between the reasonable cost of the construction of said Railroad and the amount misspent by them in so doing, and an accounting by Whittaker and Van Riper of their management of the funds and business of the Railroad Company, the Land Company and the Florida Company.

8.   To ascertain the true cost of the construction of the Railroad and the true amount spent for the purchase of the pine lands, and to declare such amounts first liens upon the properties of each of said companies separately for the benefit of all persons who *bona fide* put up money therefor, and to permit complainants to redeem said properties by paying off said liens within a specified time, or in the event of their failure so to do, to have said properties sold to pay said liens, the balance over and above said liens to go to the *bona fide* stockholders of the Railroad and Land Companies.

9.   For general relief."

As the contracts sought to be annulled cannot be epitomized without in some degree changing their import, I give them in full:

"This Agreement, made and entered into this tenth day of May, A. D. 1905, by and between Charles B. Duffy, Robert H. Hemphill and William R. Hauze, parties of the first part, and Whittaker & Company, J. C. Van Riper and David Sommers, parties of the second part, WITNESSETH:

That Whereas, the parties of the first part own or control all of the capital stock of the Apalachicola Northern

Railroad Company (a corporation organized under the laws of the State of Florida), and

Whereas the parties of the first part are desirous of obtaining the sum of One Million Dollars, the amount necessary to construct and equip the said Railroad ready for operation, and

Whereas, the parties of the second part represent that they are ready, willing and able to obtain said sum to be used for such purpose, by using the stock, bonds and other securities of said Railroad Company in the manner set forth in another and separate agree ent dated the Eleventh day of May, A. D. 1905,

Now Therefore, in consideration of the services of the parties of the second part in raising and obtaining said sum of One Million Dollars for the construction and equipment of said railroad,

It is Hereby Agreed that Whittaker & Company shall have one-twelfth, J. C. Van Riper one-twelfth, David Sommers two-twelfths of the capital stock of said Railroad Company.

And It Is Further Agreed that all of said stock shall be issued to the different parties entitled to the same, the certificates stating the number of shares to each, and that all of said stock shall be pledged as collateral security for the payment of the indebtedness of the Railroad Company above mentioned.

And It Is Hereby Agreed that all of said capital stock shall be pooled and voted for a period of five years according to the terms of said agreement dated the eleventh day of May, A. D. 1905.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

(Five copies executed.)

(Signed)    CHAS. B. DUFFY    · (Seal)
R. H. HEMPHILL
By CHAS. B. DUFFY    "
W. R. HAUZE    "
WHITTAKER & CO.    "
J. C. VAN RIPER    "
DAVID SOMMERS."    "

THIS AGREEMENT made and entered into this Tenth day of May, A. D. 1905, by and between Charles B. Duffy, Robert H. Hemphill and William R. Hauze, parties of the first part, and Whitaker & Company, J. C. Van Riper and David Sommers, parties of the second part, WIT-NESSETH:

THAT WHEREAS, all of the parties hereto are interested in the construction and equipment and operation of the Apalachicola Northern Railroad Company, and

WHEREAS, the parties of the first part have heretofore commenced the formation of a corporation known as the St. Joseph Land and Development Company, organized under the laws of the State of Florida with a capital stock of One Million Dollars, which said harbor and dock privileges, etc., as set forth in its charter, and

WHEREAS, the parties of the second part have furnished or caused to be furnished, the sum of Five Hundred Thousand ($500,000) to be used in the purchase of timber lands and the business of the Company, and have been instrumental in financing the construction and equipment of said Railroad,

NOW THEREFORE, IT IS HEREBY AGREED that when the incorporation is completed and charter obtained, certificates shall be issued conveying to each of the following named parties the number of shares set opposite each name.

Whitaker and Company—one seventh of the capital stock.

J. C. Van Riper, one seventh of the capital stock,
Charles B. Duffy, one seventh  "  "   "   "
R. H. Hemphill, one seventh  "  "   "   "
W. R. Hauze, one seventh  "  "   "   "
David Sommers, two sevenths "  "   "   "

AND IT IS FURTHER AGREED that all of said capital stock shall be pledged as collateral security for the payment of the indebtedness mentioned in a certain agreement dated the Eleventh day of May, A. D. 1905, according to the terms of said agreement, and that all of said capital stock shall be held in a pool and voted for a period of five years from said date, according to the terms set forth in said agreement.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written:

(Five copies executed.)

        (Signed)   CHAS. B. DUFFY    (Seal)
                R. H. HEMPHILL,
                By CHAS. B. DUFFY,  "
                W. R. HAUZE        "
                WHITAKER & CO.    "
                J. C. VAN RIPER    "
                DAVID SOMMERS,   "

"THIS AGREEMENT, made and entered into this eleventh day of May, A. D. 1905, by and between CHARLES B. DUFFY, party of the first part, and WHITAKER & COMPANY and J. C. VAN RIPER, parties of the second part, WITNESSETH:

THAT WHEREAS the party of the first part owns or controls all of the capital stock of the Apalachicola Northern Railroad Company, amounting to Two Million

Dollars ($2,000,000), and all of the capital stock of the St. Joseph Land and Development Company, amounting to one million dollars ($1,000,000), and is desirous of borrowing $1,500,000 for the purpose of building and equipping said Apalachicola Northern Railroad Company, and of paying for certain lands for the St. Joseph Land and Development Company, and in order to obtain said $1,500,000 the party of the first part hereby agrees as follows:

FIRST: To organize The Florida Company, or a holding company, under the laws of the State of Florida, or under the laws of any State that may be desired by the party of the second part, which said Holding Company (when organized) shall become the owner of all of the stocks and all of the bonds of the aforesaid Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company.

SECOND: Said Holding Company shall pledge all of its stocks and bonds and collateral security for the repayment of $1,500,000 payable on or before three years after date with interest at the rate of 5% per annum, payable semi-annually.

THIRD: The stock of the above named Apalachicola Northern Railroad Company and St. Joseph Land and Development Company shall be pooled for a period of five years, and controlled by four Trustees, two of which are selected by party of the first part, and two by parties of the second part.

FOURTH: There shall be seven (7) Directors in each of said companies, three of which are to be named by trustees of party of the first part, and three by trustees of parties of the second part, and the seventh director in each company shall be named by the Illinois State Trust Company, trustee in both pooling agreements.

"FIFTH: The holding company shall have seven directors to be selected by the same parties and in the same manner set forth in fourth paragraph hereof, and the stock issued by it shall be pooled and held in the same manner and for the same period of time as set forth in third paragraph hereof.

"SIXTH: The Railroad Company is entitled to a subside of five thousand (5000) acres of land per mile constructed under its charter, this subsidy land being granted by an Act of the Legislature of Florida. The title to this subsidy land will not become vested in the Railroad Company until the Railroad is completed, but the mortgage or trust deed covering said Railroad Company to secure its issue of bonds shall be made in the blanket form to include all subsidy lands as the title to same becomes vested in said Railroad Company.

"SEVENTH: That the contract for building and equipping said Railroad shall be let to the Morey Engineering & Construction Company at cost and a profit of 10% in addition thereto. The contract is to be made between the Railroad Company and the said Construction Company direct under such plans and specifications as are approved by Charles B. Duffy and J. C. Van Riper.

"EIGHTH: The collateral agreement and the collateral notes are to be of such form as is designated by the party of the second part except the notes are to be payable on or before three years after date with interest at 5% payable semi-annually.

"NINTH: The moneys derived from the notes are to be used in building and equipping said Railroad and the purchase of lands for the St. Joseph Land and Development Company as may be agreed on, except that out of such moneys can be paid the office expenses of the Rail-

road Company during the construction period, and the interest charges.

"TENTH: All of the land contracts now obtained or to be obtained, and any and all lands that may be given or donated for the building of the Railroad as well as all lands heretofore purchased at St. Joseph's Bay are to be deeded to the said Land Company.

"ELEVENTH: The entire issue of said Railroad Company's bonds may be sold to the highest bidder at not less than 85% of their par value.

"TWELFTH: If considered advisable by the parties interested the tract of land known as the 'Powers tract' purchased from the Pine Forest Land Company may be sold at not less than $10.00 per acre.

"THIRTEENTH: The subsidy lands may be sold at not less than $4.00 per acre.

"FOURTEENTH: During each year the pooling agreement is in force, the Presidents of each of the three Companies are to be named by the Trustees selected by the party of the first part, and the Treasurers of each Company during said period are to be named by the Trustees selected by parties of the second part. All other officials are to be agreed upon.

"FIFTEENTH: It is agreed that all moneys derived from the sale of lands, timber, turpentine rights, the operation of said Railroad, or from any other source, by either of said companies, shall be paid to the Illinois State Trust Company, trustee, and at an agreed time shall be used in the payment of the indebtedness mentioned herein.

"SIXTEENTH: It is agreed that the parties of the second part shall receive for their services in disposing of the notes above mentioned, the sum of $750,000 to be paid on or before three years from date, the collateral securi-

ties of the holding company shall be held in trust for the payment of the above mentioned $750,000 and the $1,500,-000 hereinbefore mentioned.

"SEVENTEENTH: It is agreed that when the indebtedness herein mentioned is all paid, the securities held by the Illinois State Trust Company shall be returned to the Florida or holding Company.

"EIGHTEENTH: If after investigation the parties of the second part shall be satisfied that the corporations herein above mentioned are legally constituted, and all proceedings connected with said corporations have been properly performed, and the title to the lands mentioned are good, and the report of their representatives as to the value of the Pine Forest Land Company tract is satisfactory, then the parties of the second part agree to negotiate said notes and obtain the sum of $1,500,000 to be used as aforesaid, and agree to advance the sum of $250,-000 of this amount to be used in exercising the option of purchase on the Pine Forest Land Company tract on the seventeenth day of May, 1905, the balance of the money to be used as above set forth.

"IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

(Signed), CHAS. B. DUFFY,    (Seal)
        WHITAKER & CO,    "
        J. C. VAN RIPER,    "

Without attempting to give a synopsis of the bill, it charges that in furtherance of a fraudulent scheme to freeze out the complainants and get possession of the valuable franchises, subsidies, options, lands and other properties of the Apalachicola Northern Railroad Company and of the St. Joseph Land and Development Company, Whitaker & Company and Van Riper violated the

agreements of May 10th and 11th and caused the Apalachicola Northern Railroad Company, the St. Joseph Land and Development Company and the Florida Company to do certain acts which were illegal and *ultra vires*, and that the voting power of the stock was so exercised by a pooling company as to wreck the Apalachicola Northern Railroad Company and St. Joseph Land and Development Company, and to defraud the complainants of their stock in these companies and of their valuable properties. The defendants demurred to the bill, on the grounds that,

1. There is no equity in the bill.

2. That the complainants had not offered to do equity.

3. That the complainants have no interest in the subject matter.

4. That the bill is multifarious.

5. That the complainants are barred by their laches.

6. That the complainants are estopped.

The bill prays:

1. That the two contracts of May 10th, 1905, and the contract of May 11th, 1905, be declared null and void and cancelled, and that the bonds and mortgages of the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company be cancelled as a cloud upon the lands and properties of said companies.

2. That the Illinois State Trust Company be ordered to deliver the bonds and mortgages and the stocks of the Railroad and Land Companies to said company and that the legally owned stocks be issued to the stockholders in proportion to their interest, except that Whitaker, Collins and Van Riper be divested of all their interest therein because by their fraudulent practices.

3. That the first and second mortgage bonds of the Florida Company be declared null and void.

4. That the Pine Forest Land Company be enjoined

from foreclosing the Wilfley mortgage, but that any amount that is due said company be ascertained in this proceeding and adjudged a lien upon the lands and properties of the St. Joseph Land and Development Company.

5. That all proceedings of the Morey Engineering and Construction Company against the Apalachicola Northern Railroad Company *et al* be enjoined; and for an accounting, and whatever is due the Morey Construction Company be adjudged a lien on the properties of the Railroad Company subject to a prior lien in favor of *bona fide* subscribers for the million five thousand dollars first mortgage bonds of the Florida Company to the extent that the money so derived was used in the contruction of the said railroad.

6. That E. A. Faulhaber be removed as Receiver of the Apalachicola Northern Railroad Company and a proper person appointed as Receiver of the Railroad Company and the Land Company.

7. That an accounting be had to ascertain how much of the proceeds of the sale of the Florida Company's million five hundred thousand dollar bonds was used in part payment for the lands, properties and debts of the St. Joseph Land and Development Company, and how much was used in the construction of the Apalachicola Northern Railroad, and that such amounts be declared a lien upon the properties and lands of the said companies according to the separate benefits received, and that such lien be declared a first lien and prior to any lien of the Morey Engineering and Construction Company, and that the lien against the lands of the St. Joseph Land and Development Company be declared a second lien, and subject to the lien of the Pine Forest Land Company.

8. That an accounting be had with the Morey Engineering and Construction Company, Whitaker and Com-

pany and J. C. Van Riper as to the reasonable price and cost of the construction of the Railroad, and the amount paid by Whitaker and Company and Van Riper to the Morey Engineering and Construction Company, and for judgment in favor of the Railroad Company against the Morey Company and against Whitaker and Company and Van Riper for the difference between the reasonable and proper cost of the construction of the railroad and the amount actually paid to Morey Company by Whittaker and Company and Van Riper; and for accounting between the Railroad Company and the Land Company and Whitaker and Company and Van Riper, for monies received and expended in the completion of the payment for lands of the Land Company, and in the construction of the railroad, and for judgment in favor of the Land Company and the Railroad Company against Whitaker and Company and Van Riper for all monies improperly or illegally paid by them out of the trust funds, that came into their hands.

9. That the Railroad and Land Companies be allowed a reasonable time to discharge the liens adjudged against each, and if same are not paid at the expiration of such time the property, lands and franchises of either or both be sold to satisfy the liens.

The complainants' theory of the case is that the several wrongful and unlawful acts which they allege certain of the defendants caused the three corporations to do, were performed by the corporations acting as such, and that such corporate acts were *ultra vires* and void. The defendant's theory is that the acts complained of were the acts of individuals and that the doctrine of *ultra vires* does not apply. Thus, counsel for appellees say, "Suppose these complainants instead of going to St. Louis and being the owners of bonds and stock of Florida corpora-

tions, had gone to a bank in Tallahsasee for a loan, and the application for the loan had been granted and they had executed a collateral note and had deposited the stocks and bonds of the corporations as security for the payment of their note and on the due date of the note they had made default in payment and the bank had advertised the collateral for sale and had sold it, would the situation have been greatly different? We think not."

I think the bill sustains the appellants' theory. The several allegations that certain of these defendants "caused" the Apalachicola Northern Railroad Company, the St. Joseph Land and Development Company and the Florida Company to do certain things are equivalent to charging that the corporations as such, did them, and the language used is for the purpose of emphasizing the complete domination by these defendants of the directors of the several corporations. The bill charges the commission of a number of illegal and *ultra vires* acts, but before proceeding to the discussion of any of them, I may observe that the bill sets out a most ingenious and stupendous scheme to wreck the Railroad Company and the Land Company and to defraud the complainants of their interest and property therein. Ingenious and involved as was the scheme, it is fortunate that the policy of the law is to circumvent such fraudulent practices, and to restore to the victims, what they would be robbed of but for the intervention of courts of equity.

In the treatment of this case I will first discuss the acts and doings of the corporations performed in compliance with the terms of the contracts, and next, what they did contrary to, without the authority thereof.

In discussing the contracts themselves it is first necessary to ascertain if they required the corporations to do any illegal or *ultra vires acts*. In doing this the con-

tracts must be treated as one, in-so-far as their contradictions and inconsistencies will permit.   The parties of the first part in the contract of May 10 were Duffy, Hemphill and Hauze, on behalf of the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company.   But in the contract of May 11, Duffy alone is the party of the first part.   In all these contracts Whitaker & Company, Van Riper and Sommers are the parties of the second part.   Notwithstanding both the contracts of May 10 refer to a contract dated May 11, there are such discrepancies between them as to create a doubt whether the parties who signed the first contracts, contemplated or fully understood the stipulations of the second.   However that may be, it is apparent from the contracts and the allegations of the bill, that Whitaker and Company and Van Riper had a sinister purpose in the unique method they pursued in making these contracts.

The Railroad Company's contract of May 10 recited that Duffy, Hemphill and Hauze, own or control all the capital stock of the Railroad Company.   The Land Company's contract of same date recites that the same parties have commenced the formation of a company known as the St. Joseph Land and Development Company, but in the contract of May 11, Duffy asserts that he owns and controls all the capital stock of the said St. Joseph Land and Development Company amounting to $1,000,000.00. Why Hemphill and Hauze are not parties to this contract and how this Company which was not organized on the 10th became a fully organized corporation on the 11th and Duffy became the owner or representative of its entire capital stock amounting to $1,000,000.00 is unexplained.

Ostensibly the purpose of the Railroad Company was to borrow a million dollars to construct and equip the Apalachicola Northern Railroad Company, and of the St. Joseph Land and Development Company to borrow five hundred thousand dollars to purchase timber lands on which it had options. The contracts provided for the organization of a holding company which when organized should become the owner of all the stocks and all the bonds of the Railroad Company and the Land Company, and the holding company was to pledge the same for the repayment of a million and a half dollars to be raised on its notes, and the money derived therefrom was to be used to build and equip the railroad, and to purchase lands for the St. Joseph Land and Development Company and for the office expenses of the Railroad Company during the construction of the road, and the interest charges. There is nothing in the contracts to indicate that these monies were to be kept separate, or that the million dollars raised on the security of stocks and bonds of the Railroad Company was to be used exclusively for building and equipping the railroad, and that the $500,000.00 raised on the securities of the Land Company were to be used exclusively to pay for lands for the Land Company, but the money was to be used as required for either of these purposes, and for office expenses during the construction period, and for interest charges. Thus the Railroad Company and the Land Company were each to guarantee the payment of the obligations of the other, and pledge their stock mutually for that purpose. In effect they were to become partners in the joint enterprise of building and equipping the Apalachicola Northern Railroad Company and buying lands for the St. Joseph Land and Development Company. It is true, this was to be done through the medium of a

13—Vol. 75

holding company, but however it was done, the effect was that they became guarantors for each other. It seems well settled that a railroad corporation has no power to become the guarantor of another corporation, unless authorized by statute to do so. There is no statute in Florida giving such authority, and this court governed by sound principles of public policy, should declare such guarantee *ultra vires* and void. In the case of Louisville, N. A. & C. Ry. Co. v. Louisville Trust Co., 174 U. S. 552, 19 Sup. Ct. Rep. 817, the court said: "A railroad corporation, unless authorized by its act of incorporation or by other statutes to do so, has no power to guarantee the bonds of another corporation; and such a guaranty, or any contract to give one, if not authorized by statute is beyond the scope of the power of the corporation, and strictly *ultra vires*, unlawful, and void, and incapable of being made good by ratification or estoppel."

In People v. North River Sugar Refining Co., 121 N. Y. 582, text 626, 24 N. E. Rep. 834, the court said: "Without either approval or disapproval of the views expressed upon that branch of the case by the courts below, we are enabled to decide that in this State there can be no partnerships of separate and independent corporations, whether directly, or indirectly through the medium of a Trust."

In Pearce v. Madison and Indianapolis Railroad Company and Peru and Indianapolis Railroad Company, 21 How. (U. S.) 441, two corporations organized to build two distinct lines of railroad, consolidated; it was held, they had no right to do so or to place both under the same management, or to subject the capital of one to answer for the liabilities of the other, without legislative

authority.   Citing McGregor v. The Official Manager of
the Deal and Dover Railway Co., (16 L. and Eq. 180),
where it was held that a railroad company "was bound
to apply all the funds of the company for the purposes
provided for by the act, and for no other purpose what-
ever, and a contract to do something beyond these was
a contract to do an illegal act."

People invest their money in the capital stock of a
corporation with a knowledge of the purposes for which
it is organized, and the limitations placed upon its powers
by the statutes of the State, and they take the risks inci-
dent to the business of the corporation when acting
within the limits of the articles of incorporation and
the laws of Florida, and they are not to be subjected
to new and unconsidered risks which may result from
the corporation pledging its stocks or bonds for the bene-
fit of another and distinct corporate organization.  Part-
nerships between a railroad corporation and a separate
and independent ordinary corporation whether directly,
or indirectly through the medium of a trust, and the
pledging of the stock or bonds of the former for the
benefit of the latter, are against public policy, and not.
authorized in this State, and acts in furtherance thereof
are against public policy, *ultra vires*, and void.   The
tendency of the courts to enlarge the implied powers of
ordinary corporations have been noted by writers on the
law of corporations (3 Cook on Corporations, Sec. 681),
but I am not prepared to assent to the rule laid down
by that authority, that "The Courts are becoming more
liberal, and many acts which fifty years ago would have
been held to be *ultra vires* would now be held to be
*intra vire*.  The courts have generally enlarged the
implied powers of ordinary corporations until now such
corporations may do almost anything that an individual

may do, provided the State and the stockholders and creditors do not object."

The Federal Court, however, upholds the old, and as I think, the better rule, in all its rigor, that "The doctrine of *Ultra vires,* by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds; the obligation of anyone contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law." McCormick v. Market Nat. Bank of Chicago, 165 U. S. 538, 17 Sup. Ct. Rep. 433; Madison and Indianapolis Railroad Company and Peru and Indianopolis Railroad Company, 21 How. (U. S.) 441; Pittsburg, C. & St. L. Ry. Co. v. Keokuk & Hamilton Bridge Co., 131 U. S. 371, 9 Sup. Ct. Rep. 770; Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 24, 11 Sup. Ct. Rep. 24. But not only did the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company pledge their stocks and bonds for the benefit of each other, but the stocks and bonds of the Florida Companies were pledged to secure an issue of bonds by a third corporation organized under the laws of Maine, known as the Florida Company, and to secure the payment of seven hundred and fifty thousand dollars demanded by Whitaker and Company and Van Riper for raising a million and a half dollars for the Florida Company. What has already been said about the illegality of the transaction by which the Railroad Company and the Land Company pledged their stocks and

bonds to raise a fund to be used indiscriminately for the mutual benefit of both, and for other purposes, applies to this transaction with even greater force, for while there might be circumstances under which two ordinary corporations organized under the laws of Florida for the furtherance of the same general purpose might become mutually guarantors for each other, when the purposes was a proper one and the funds were honestly, fairly and equitably administered, I think it against public policy for the Railroad Corporation and the Land Com- pany to pledge all their stocks and bonds to secure the bond issue of a foreign corporation. To permit such a transaction would make the stockholders in the pledging companies liable for the honesty and efficiency of a cor- poration in the management of whose affairs they would have no voice or control. Stockholders in corporations organized under the laws of the State of Florida have the right to expect that they will receive protection from the laws of the State, and unless the legislature gives to a Florida corporation the right to pledge its stocks and bonds for the benefit of a foreign corporation the courts should not sanction such transactions. If on the other hand it is contended that the pledging of the stock and bonds of the two Florida companies for the bond issue of the Maine Company was merely to raise money through the medium of that company for the benefit of the Florida companies, I see no necessity for the transaction. If the Maine Company raised the money by the sale of its bonds solely on the security of the stock and bonds of the two Florida companies, there was no reason why the money could not have been raised by the Florida companies upon these same securities. The bill, however, discloses the reason, and charges that it was part of a scheme by the defendants,

Whitaker and Company and J. C. Van Riper to so manage and control the affairs of the Railroad Company and the Land Company as to secure for themselves all the bonds and stocks of both the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company and to fraudulently freeze these complainants and the other stockholders of the Railroad and Land Companies out of their holdings in the said company. The bill clearly, fully and specifically discloses how this was done and details the various transactions in the scheme to defraud and dispoil the complainants. However plausible the scheme may appear, if the purpose as disclosed by the subsequent acts, is fraudulent and dishonest, it should not be sanctioned even if it requires the application of a rigid rule, and one which some courts are inclined to relax; but in doing this I think we would be in accord with the rule laid down by the United States Supreme Court.

It is not an arbitrary rule of law which prohibits one corporation from pledging its stocks and bonds for the security of a bond issue of another corporation. It is founded not only on the principle of affording protection to stockholders of a corporation from risks not contemplated by them, but is intended to prevent one corporation from getting hold of the stocks of another and using them for their own interest or to the injury or for the destruction of the other.

The peculiar and involved method adopted to effect the simple transaction of borrowing a million five hundred thousand dollars for the Railroad Company and the Land Company, and pledging their respective stocks and bonds therefor, give color to the charges in the bill that the transaction was conceived in a fraudulent intention

to freeze out the complainants, and take from them the valuable properties which they had acquired by their investment of time and skill and money. This corrupt intention is more fully shown by the subsequent trans-actions described in the bill, than by the contracts them-selves.

The bill charges and the demurrer admits, that for more than eighteen months last past, Whitaker and Company and Van Riper had declared and boasted their intention to so manage and handle the affairs of the Florida Companies and the Maine Company, as to cheat and defraud complainants out of their interest in said companies, and to obtain and acquire for themselves all the property of the Railroad Company and the Land Company, which are reasonably worth many million dollars over and above the valid and legitimate indebt-edness of the Companies. This was to be accomplished by means of a scheme by which the stock of these com-panies was to be pooled for five years and its voting powers exercised by a trust, independent of and uncon-trolled by the owners of the stock, and that the increase in the capital stock of these corporations, and the several bond issues, if there was any attempt to give them the semblance of regularity, were accomplished by this vot-ing trust, and not by the *bona fide* owners of the stock, exercising the right to vote the same.

The bill does not clearly allege who exercised the vot-ing power of the capital stock of the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company and the Florida Company. The Railroad's contract of May 10, provided, that the stock of the Apalachicola Northern Railroad Company shall be pledged as collateral security for a loan of a million dollars; and that all the capital stock shall be

pooled and voted for a period of five years, according to the terms of an agrement dated May 11th. The same provisions are found in the Land Company's contract of same date. The first clause in the contract of May 11 provides for the organization of a corporation which shall be a holding company and "when organized shall become the owner of all the stocks and all the bonds of the A. N. Ry. Co. and the St. J. L. and D. Co." The contract further provides that the stock of both these companies shall be pooled for five years and controlled by four trustees, two of which shall be selected by Duffy, and two by Whitaker and Company and Van Riper; that there shall be seven directors for each of these corporations, three of which shall be named by the trustees named by Duffy, and three by those named by Whitaker and Company and Van Riper, and the seventh by the Illinois Trust Company; the President of each of the three corporations was to be named by the Trustees selected by Duffy, and the Treasurer of each was to be named by the trustees selected by Whitaker and Company and Van Riper. "All other officials are to be agreed upon." Briefly the situation with regard to the stock was this: it was owned outright by certain individuals; the contract of May 11th, says it was to be owned by the holding company when organized; it was to be pooled and voted by trustees; it was pledged as collateral security to the Illinois Trust Company.

Notwithstanding this rather uncertain status of the stock, I will consider the matter in the light most favorable to the defendants, and presume that in the election of officers the stock was voted by the trustees, although such elections were entirely perfunctory, as the contracts left the trustees no discretion in the choice of the directors.

This brings me to the question of whether a Florida corporation may transfer its stock to trustees, who shall exercise the power of controlling the affairs of the corporations. There is much conflict of authority upon this subject. Some take the extreme, and perhaps the better view, "that an agreement by which the voting power of stock is severed from the beneficial ownership is void *per se* irrespective of the propriety of the purpose sought to be accomplished in the particular case." Harvey v. Linville Imp. Co., 118 N. C. 693, 24 S. E. Rep. 489; Bridgers v. Staton, 150 N. C. 216, 63 S. E. Rep. 892; Sheppard v. Rockingham Power Co., 150 N. C. 776, 64 S. E. Rep. 894; Bridgers v. First Nat. Bank, 152 N. C. 293, 67 S. E. Rep. 770; Kreissel v. Distilling Co. of America, 61 N. J. Eq. 5, 47 Atl. Rep. 471; Warren v. Pim. 66 N. J. Eq. 353, 59 Atl. Rep. 773; Ohio & M Ry. Co. v. State, 49 Ohio St. 668, 32 N. E. Rep. 933; Sullivan v. Parkes, 69 App. Div. 221, 74 N. Y. Supp. 787; Guernsey v. Cook, 117 Mass. 548; Woodworth v. Wentworth, 133 Mass. 309; White v. Thomas Inflatable Tire Co., 52 N. J. Eq. 178 ,28 Atl. Rep. 75; Gage v. Fisher, 5 N. Dak. 297, 65 N. W. Rep. 809, 31 L. R. A. 557; Morel v. Hoge, 130 Ga. 625, 61 S. E. Rep. 487, 16 L. R. A. (N. S.) 1136.

Writers on this subject, however, claim that there has been a gradual change in the tendency of the courts to modify the rule which declares all contracts to create a voting trust illegal and void. Thus—"The fact that the earlier cases were practically unanimous in holding these pooling or voting trusts illegal, and that some law-writers and perhaps some courts have broadly stated that all such contracts are void, must, in the light of subsequent cases, and the advancement and development of corporation law, be regarded as an application of a principle to all cases which was intended to fit but one.

Under recent and advanced decisions it may be asserted as the present prevailing doctrine that a pooling trust created by a deposit of certificates with a trustee for a specified period of time with the authority to vote the same for the benefit of the owners and to the best interests of the corporation, and without an absolute separation of the voting power from the ownership of the stock, by an agreement which is not a restraint of the alienation of property, not in restraint of trade, not against public policy, and not a fraud on the stockholders is legal."

I give the conclusions drawn by this writer from his analysis of the decisions not in entire approval of them, but to show the trend of the courts towards what is called a more liberal, but which seems to me to be a more dangerous doctrine. In Ruling Case Law, Vol. 7, Sec. 329, the deductions drawn from the decisions are thus stated: "The decisions passing upon the validity of such stock voting agreements or voting trusts are to the general effect that the agreement is not unlawful in itself, but that its validity depends upon the legality of the purpose for which the agreement is formed. There is, however, a marked lack of uniformity in the cases. Some of them are decided upon considerations as to the nature of irrevocable proxies; others rest upon the Statute law of the State in which they are rendered; yet others assert inseparability of the voting power of stock from its owenership; while very many as stated, rest upon the fraudulent or otherwise objectionable character of the object to be attained. According to a few decisions an agreement by which the voting power of the stock is severed from the beneficial ownership is void *per se,* irrespective of the propriety of the purpose sought to be accomplished in the particular case."

It is well settled that corporations organized under legislative authority have only such rights and powers as are given them by express or implied provisions of law. McQuaig v. Gulf Naval Stores Co., 56 Fla. 505, 47 South. Rep. 2; Trustees of Dartmouth College v. Woodward, 4 Wheat. (U. S.) 518; Thomas v. Railroad Co., 101 U. S. 71. The Florida statute provides: "In all elections of officers and in deciding all questions at stockholders' meetings, each stockholder shall be entitled to one vote on each share of stock held by him, but no stockholder whose liability for unpaid assessments or calls is past due shall be allowed to vote. Stockholders may vote by proxy, duly authorized in writing." Sec. 2671 Gen. Stats. of Florida, 1906, Compiled Laws of Florida, 1914.

The section providing for the election of officers is as follows: "The business of the corporation shall be managed and conducted by a president, a board of directors, a treasurer or cashier and such other officers and agents as the corporation may authorize. The directors shall be chosen annually by the stockholders at the time fixed in the charter; they shall be stockholders qualified to vote at the election at which they are chosen. The manner of the choice and of the choice of all other agents and officers shall be prescribed by the by-laws. One of the directors shall be chosen president by the directors or by the stockholders, as the by-laws shall direct." Sec. 2663 Gen. Stats. of Florida, 1906, Florida Compiled Laws, 1914.

There is no provision in the Florida Statutes similar to to that of some of the other States, permitting a person holding stock as executor, administrator, guardian or trustee, or in any other representative or fiduciary capacity to vote thereon as a stockholder, and so it would

seem to be the policy of our law, that only a stockholder may vote. In most, if not all, the States where the courts have sanctioned the separation of the voting power of stock from the beneficial interest, it has been because of the existence of such statutes, the courts holding that the authority for executors, administrators, guardians and trustees, voting as stockholders, is an expression of the legislative sanction of such separation. This is the position taken by the Supreme Court of Virginia, and while the court does not rest its decision entirely upon the statute, it cites it and discusses its effect upon the public policy of the State. The Virginia statute provides that unless there is anything to the contrary in the charter or its articles of incorporation or its by-laws, "each person in whose name stock shall stand upon the books of any corporation * * * shall be entitled to one vote in person or by proxy for each share of stock appearing in his name on said books." In discussing this and other clauses of the statute in relation to the exercise of the voting power of stock, the court said: "The legislature must have known that it was dealing with a subject of the utmost importance, and one as to which there was great controversy and contrariety of opinion. It certainly cannot be said that the statutes to which we have referred contain any inhibition upon, or condemnation of, the separation of the ownership of stock from the right to vote upon it. We repeat that this was the *crux* of the controversy. It is the point around which the whole contest had been waged before many courts,—that it was, in, and of itself a violation of sound public policy to put the ownership of stock in the hands of one person, and the right to vote upon that stock under the control of another; and yet the legislature of this State, which it is impossible to

consider ignorant of such a question, deals with the subject, regulates the right to vote upon stock under many varying aspects and conditions of ownership and representation, without a hint or suggestion that a voting trust is in violation of public policy, when, if it had been of that opinion, a line upon the subject would have put the whole controversy at rest. So far from condemning a voting trust, it may well be argued that clause 21 in fact approves them at least in so far as it recognizes as lawful that which constitutes the principal ground upon which such trusts have been elsewhere disapproved, for it declares that the right of a person holding stock in a fiduciary capacity, to represent such stock at the meetings of any corporation, and to vote thereon, shall be as provided by any agreement heretofore or hereafter made between such person and the beneficial owner concerning such stock or the right to vote thereon; the only condition being that such an agreement or copy thereof shall have been furnished to the corporation."

The Virginia Court, however, notwithstanding its finding that the separation of the voting power of stock from the beneficial interest, is sanctioned by the statutes of the State, recognized the principle which seems generally to govern the courts where such separation is permitted, that the courts must decide each case upon what is the nature and character of the transaction to be performed by the trust, and how the trust has been administered, and that there must be no oppression, immorality, fraud, or bad faith as to the actuating motive. Thus in the leading Virginia case, which is one of the leading cases in this country in support of voting trusts, the court said: "The bill does not charge that the agreement * * * was procured by fraud; it does not charge

that it is fraudulent upon its face; and there is no charge of any fraudulent purpose on the part of the trustees or any other person, natural or artificial, who is made a party to the bill. * * * The record in this case does not disclose any element of oppression, immorality, fraud, or bad faith as the actuating motive underlying the February agreement." Carnegie Trust Co. v. Security Life Ins. Co. of America, 111 Va. 1, 68 S. E. Rep. 412, 31 L. R. A. (N. S.) 1186.

In the instant case, the bill fairly bristles with charges of fraud, and plans to cheat and swindle, and the execution of the same by certain of the defendants; and it discloses oppression, immorality, fraud and bad faith as the actuating motives underlying the contracts, and in the subsequent conduct of the defendants who controlled the stock of the two Florida Companies and the Maine Co pany.

A few courts have found sanction for voting trusts, in the provision in the statutes which permit stockholders to vote by proxy, but the weight of authority is strongly against that proposition. A proxy represents the owner of the stock, and his vote is that of the owner who may control it by specific instructions, and may, by appearing in person reassume his right to vote his shares. There is therefore no separation of the voting power from the beneficial interest, as the vote of the proxy is the act of the stockholder whose judgment and will he is voicing.

Vice Chancellor Pitney, now Mr. Justice PITNEY of the Supreme Court of the United States in construing the New Jersey statute, which fixes the right to vote stock in corporations, repudiates the doctrine laid down by some of the courts, that the right to establish an irrevocable voting trust for any definite or indefinite time,

finds authority in statutes which permit voting by proxy, and applies the maxim *expressio unius est exclusio alterius.* The Florida statute makes no exception to the requirement that each share of stock shall be voted by the stockholders, and thus seems to exclude all other methods of voting at stockholders' meetings. The provision for voting by written proxy, is not an exception, but merely an extension of the power of a stockholder, so that he may vote, although unable to be physically present. For a discussion of this question see Smith v. San Francisco & N. P. Ry. Co., 115 Cal. 584, 47 Pac. Rep. 582, 35 L. R. A. 309; Carnegie Trust Co. v. Security Life Ins. Co. of America, *supra.*

The Supreme Court of the United States recognizes the rule that the powers of a corporation organized under legislative authority are only such as the statutes confer, "and the enumeration of them implies the exclusion of all others." Anglo-American L., M. & A. Co., v. Lombard, 132 Fed. Rep. 721; Thomas v. Railroad Co., 101 U. S. 71; De la Vergne Refrigerating Mach. Co. v. German Sav. Inst., 175 U. S. 40, 22 Sup. Ct. Rep. 20 See also State *ex rel.* Crow v. Lincoln Trust Co., 144 Mo. 562, 46 S. W. Rep. 593, where State and Federal authorities are cited sustaining the rule.

One of the purposes of having stock voted by the beneficial owners is that in so doing, they try to promote the welfare of the corporation, for upon its success depend their profits; but when the voting power is transferred to a voting trust, it may become more to the interest of the latter to destroy the corporation whose stock it controls, and thus defeat the very purpose for which the corporation was organized. Thus, the stockholders of the Apalachicola Northern Railroad Company, and of the St. Joseph Land and Development Com-

pany would be greatly concerned in the welfare of these corporations, for upon their successful management, large profits would accrue, but by the same token, the members of the voting trust who were to control the affairs of these corporations might be—and the case made by the bill shows they were—more interested in so managing their business as to prevent them from earning anything to pay off the indebtedness, and thus require a sale thereof, at which those who controlled the stock could get possession of the properties.

The case of Mobile and O. R. Co. v. Nicholas, 98 Ala. 92, 12 South. Rep. 723, was one where a voting trust was sustained, and the court held that where an insolvent corporation whose stock has no present value, in order to prevent the absorption of the entire property, and the loss to the stockholders of their entire interest, debentures are issued to the creditors in lieu of this original evidence of debt, and as further security, place the legal title of their stock in the name of a trustee, with irrevocable power of attorney to vote upon it according to the wishes of the debenture holders, and said that "such an agreement will be sustained, because on account of the insolvency of the company the debenture holders were the real parties in interest." Mobile and O. R. Co. v. Nicholas, *supra.* There is a marked difference between that case and the one under consideration. In the case at bar, the stock of two corporations with contracts, franchises, lands, etc., worth $14,000,000.00 are deposited with a holding company to secure a loan of $1,500,000.00; a voting trust is created which so votes the stocks of these solvent corporations as to create an indebtedness which they make no effort to pay, and thereby cause both corporations to become bankrupt, and to be put into the hands of a receiver. The evil of permitting those

who have no interest in benefiting the property to vote
its shares, is well illustrated in the instant case. It was
more to the interest of those who controlled the voting
power of the stocks, that the stockholders be frozen out
and denuded of all their valuable properties, than it was
to operate the companies to the advantage of those who
had the beneficial interest in the stocks, and with the
frailty of human nature, they pursued the former course.

Two of the trustees of each of these companies were
to be selected by Whitaker and Van Riper, and two by
Duffy; there were to be seven directors, three of which
were to be named by one set of trustees, and three by
the other and the seventh was to be selected by the Illi-
nois State Trust Company. The effect of this scheme
was to place the selection of a majority of the directors
in the control of persons other than the stockholders.
This, if not a violation of the strict letter of our law,
is a violation of its spirit which requires that "the direc-
tors shall be chosen annually by the stockholders." In
discussing a similar contract Vice Chancellor PITNEY
in Warren v. Pim, 66 N. J. Eq. 353, 59 Atl. Rep. 773,
said: "And we are told that this arrangement, so preg-
nant of disastrous consequences to the future of the
Fishieries Company, so devoid of safeguards for the
substantial interests of the stockholders—majority and
minority as well—is strictly legal and equitable, and in
accord with public policy, as manifested in the General
Corporation Act of New Jersey. Let us see.

"I base my view that an irrevocable voting trust, or
any other irrevocable grant (uncoupled with an interest),
assuming to confer upon the donee the power to vote at
corporate elections for the choice of directors, is unlaw-
ful and void—first, upon the plain letter of our General

14—Vol. 75

Corporation Act (P. L. of 1896, p. 277), and *secondly,* upon the reason, spirit and manifest policy of the act.

"And first as to the letter of the law. Section 12 of the Act declares that the business of every corporation shall be managed by its directors, who are to be chosen *annually* by the *stockholders,* and shall hold office for one year and until others are chosen and qualified in their stead: * * * Section 36 declares, that unless otherwise provided in the charter, certificate or by-laws of the corporation, at every election each stockholder, whether resident or non-resident, shall be entitled to one vote, in person or by proxy, for each share of the capital stock held by him, but no proxy shall be voted on after three years from its date. And Section 17 provides that absent stockholders may vote at all meetings by proxy, in writing. From these express provisions it results, I think, according to the plainest principles of interpretation, that any other scheme of corporate management and any other kind or method of voting are impliedly excluded. *Expressio unius est exclusio alterius.* When the act says that the directors and managers of the company shall be elected by the stockholders, it means that those who are not stockholders shall not participate in such election. When it says that the directors shall be chosen annually, unless by unanimous consent expressed in the certificate of incorporation they be classified, in which case they may be elected for not longer than five years, but with the proviso that the terms of office of one class shall expire each year, it prohibits any scheme of placing managers in control of the business of the company who are without annual accountability to the stockholders. * * * When it says that absent stockholders may vote by proxy, it means that no substitute for an absent stockholder,

other than his proxy, may be admitted to vote in his stead. A proxy, *ex vi termini*, is revocable, unless it be coupled with an interest. A proxy is presumably voicing the judgment and will of his principal. An irrevocable assignment of the voting power, or, what amounts to the same thing, an act that irrevocably delegates the voting power to one who has no interest in the stock, upon trust that he will vote according to his own judgment, discretion and will, is an attempt to constitute a substitute voter who is not actuated by any interest in the welfare of the company. The difference is fundamental. * * * A vote, therefore, by the very definition, is but the formal expression of the will of those interested in the question to be voted upon.

"The right to vote is a privilege, a franchise, to be exercised in respect of the property right to which it is annexed. All the clauses of the Corporation act that touch upon the subject seem to me to show a plain purpose and policy that the management of the corporation is to be controlled by the self-interest of its proprietors, voiced at the annual stockholders' meetings, in the election of directors to manage the business. The whole of the act, and especially the provisions to the effect that any unlawful business may be conducted by such a company, that the shares of capital stock shall represent money or money's worth equal to the par value of the shares, that the directors are to be elected by the stockholders and are themselves to be stockholders, that the executive officers are to be chosen either by the directors or stockholders, that the stockholders shall have one vote for each share of capital stock held by them, &c., are eloquent to the same effect. Without multiplying references, it is plain, from every section and line of the act, that the stockholder's vote has no other reason

for existence except that the stockholders, who compose the company, who are in truth the company, whose capital stock is embarked in its enterprises, who are the proprietors of its assets and entitled to its gains and profits, are entitled at the same time, and for that reason and no other, to manage its concerns and business through the formal expression of their will, each in proposition to his interest, at the annual stockholders' meeting. The judgment of the parties interested, actuated by their interest and guided by the experience of the company from time to time and from year to year, is to dominate the management of the company; that judgment being ascertained by formal expression, according to the majority in interest for the time being, at yearly elections.

"In searching for the reason and spirit of the act in this respect it is hardly necessary to say that where the act mentions 'stockholders' as entitled to vote, I take it to mean *actual* stockholders—*real* stockholders—and not those who, from the fortuitous circumstance that they hold stock certificates without ownership of or interest in the stock itself, assuming to vote in respect thereto."

While there is a conflict of the authorities on the question of the illegality of all voting trusts, there seems to be none on the proposition that a voting trust will not be upheld, the purpose or effect of which is to defraud the stockholders, or to do an illegal act, or is in restraint of the alienation of property, or where there has been a breach of trust, or imperils the existence of the corporation itself; or where its main purpose is against public policy, or in restraint of trade. In Warren v. Pim, Vice-Chancellor PITNEY, by the most cogent reasoning destroyed the very foundation upon which voting trusts

have been established, and challenged the doctrine that good purposes and motives are any justification for them. It is true that the Vice-Chancellor in Cone v. Russell, 48 N. J. Eq. (3 Dick.) 208, 21 Atl. Rep. 847, gave utterance to an expression which was construed to mean that he approved of the rule that where the object of a pooling agreement was to carry out a particular policy with a view to promote the best interests of the stockholders, it would not be forbidden; but in Warren v. Pim, he repudiated that construction in no uncertain language, thus:

"In Cone v. Russell, the vice-chancellor in order to prevent his decision from being given an effect broader than the facts before him, said: 'This conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, where the object is to carry out a particular policy with the view of promoting the best interest of all the stockholders. The propriety of the object validates the means, and must affirmatively appear.' This language was quoted with approval by the chancellor in the Kreissl Case, and was repeated in the Chapman Case, both in the opinion of Vice-Chancellor Pitney and in the opinion delivered by Mr. Justice Garretson in this Court. As I read the facts in these cases, the *dictum* was in each instance unnecessary for the purposes of the decision. So far as it may be construed as a qualification of general doctrine declared in those cases—that irrevocable voting trusts, uncoupled with an interest in the stock, are invalid—I cannot give my assent to it. In my humble judgment, the letter and policy of the Corporation act alike requires that the right to vote shall inhere in those actually interested, and may be executed by others only under powers revocable in their nature, and limited, at all events, to three years from the time of making. If, there-

fore, an irrevocable proxy or voting trust be confided to one who is without interest in the stock, it violates the rights of non-assenting stockholders and the policy of the statute, and it is void, notwithstanding the ultimate purpose of the adoption of such means may be considered beneficial to the company. I cannot assent to the doctrine that good purposes and motives are any justification for the adoption of unlawful measures. In our law the end does not justify the means."

While it seems that the statutes of Florida do not permit the stock of a Florida corporation to be pooled and voted by a voting trust, irrespective of the purpose sought to be accomplished, it is not necessary to decide that point, as the bill charges in substance and the demurrer admits, that the agreements referred to constituted pooling agreements whose object was not "to promote the best interests of all the stockholders," but that such agreements and the acts done thereunder were intended to denude them of their properties, and wreck the corporations whose stock was voted by the trustees, and that it comes under the condemnation alike of those courts which declare all voting trusts illegal, and those which sustain voting trusts because "the propriety of the object validates the means." I am therefore quite satisfied that the voting trust created by the contracts of May 10th and 11th was illegal, invalid, against public policy and void.

I will next consider the connection of the Maine Company with the two Florida Corporations. The legally authorized capital stock of the Apalachicola Northern Railroad Company was $500,000.00. At the time the contracts were made the St. Joseph Land and Development Company had not completed its organization and the bill fails to disclose what was the amount of its authorized capital stock. The bill charges that there-

after there was issued wrongfully and without legal authority $3,000,000.00 of the stock of the Apalachicola Northern Railroad Company and $2,000,000.00 stock of the St. Joseph Land and Development Company, all in the name of Charles B. Duffy which he indorsed in blank and was taken possession of by Whitaker and Company and Van Riper and by them delivered to the Illinois Trust Company which still held them when this suit was instituted and that none of the complainants ever authorized, acquiesced in, ratified or consented to such issuance, or the use to which they were put; that neither the Illinois Trust Company nor the Florida Company nor anyone else ever paid the Railroad Company nor the Land Company a cent for the bonds or stocks; that Trump and Beverly never were parties to the issuance or use of such bonds and stocks, and never knew of same until shortly before this suit was brought; the bill charges that the delivery of the stocks and bonds of the Railroad Company and the Land Company to the Illinois State Trust Company was wholly without consideration, was violative of the public policy of Florida and was *ultra vires* the Railroad Company, the Land Company and the Maine Company, and prays that the Illinois State Trust Company be required to deliver the bonds, mortgages and stocks of the Railroad Company and the Land Company to said companies respectively. The Maine Company although authorized to issue two million dollars of capital stock only issued seven hundred dollars of stock, and it never had any property, and its entire assets consisted of the stocks and bonds of the Florida Companies. It never transacted any business apart from its connection with the Florida Companies, and was a holding company only, a mere shell organized for the purpose of carrying out the scheme concocted by the contracts of May 10 and 11, 1905.

If the purpose or effect of transferring to the Maine corporation all the stocks of the two Florida Corporations, was to make it a holding company with power to vote the stock, what I have said about voting trusts would apply to this arrangement, but it appears from the contracts that the stock was to be pooled, and voted by the four trustees, and not by the Maine Company. The contracts of May 10 each provide for *pledging* the stock of both the Florida corporations, but the contract of May 11, says, that the "Holding Company (when organized) shall become the *owner* of all the stocks and all the bonds of the aforesaid Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company.

Just what was the purpose of this provision of the contract, is not clear. That there was a purpose in it, however, cannot be doubted. The astute mind which conceived the plan to wreck the Florida Corporations as charged in the bill, put nothing in the contracts without a purpose; every sentence was formed to facilitate the scheme, or to erect barriers to prevent its demolition. It is not necessary to discover that purpose, and I shall content myself with discussing its legal effect. Notwithstanding the statement in the contract, that "the holding company when organized shall become the owner of all the stocks and all the bonds" of the two Florida corporations, the transaction will not be given that effect. There was no sale of the stocks and bonds to the Maine Company, because there was no consideration; and for the further reason that there was no holding company in existence, or in the process of organization. A similar provision in a contract was thus discussed in the case of People v. North River Sugar Refining Co., 121 N. Y. 582, 24 N. E. Rep. 834: "That contract, on the theory of a sale, is an unexpected and unaccountable document. A

sale presumes vendors on the one side and vendees on the other, each having life and existence and the power and ability to contract. Here there was no joint stock association existing or organized until the vendors themselves created it, and they were obliged to construct their vendee in the very act of transfer. A contract of sale implies some negotiation between buyer and seller, each consulting his own interest and acting independently and of his free choice. Here there was no negotiation with the board, but the vendors having created their vendee, themselves alone dictated the terms on which they should sell and it should buy."

The Maine Company could not, and never did become the owner of the stocks and bonds of the two Florida Corporations. It exercised rights of ownership, however, in that it took possession of the stock and deposited it with the Illinois State Trust Company.

This brings me to the question of the right of a foreign corporation to control the stock of a railroad corporation organized under the laws of Florida. It is contended that because the statutes of Maine permit a corporation organized under the laws of that State to purchase and hold stock in another corporation, the Maine corporation acquired the right to exercise such control over the stock of the Apalachicola Northern Railroad Company. I can not assent to that view. It seems to be well settled that one corporation cannot become a stockholder in another, unless that power has been specifically granted by statute. Franklin Company v. Lewiston Inst. for Savings, 68 Me. 43; Mutual Savings Bank and Building Asso. v. Meridian Agency Co., 24 Conn. 159; Milbank v. New York, L. E. & W. R. Co., 64 How. Pr. (N. Y.) 20; Central Building Company of New Jersey v. Pennsylvania Railroad Company, 31 N. J. Eq. 475; Hazlehurst v. Savannah,

G. & N. A. R .Co., 43 Ga. 13; Franklin Bank of Cincinnati v. Commercial Bank of Cincinnati, 36 Ohio St. 350; Memphis & C. R. Co. v. Woods 88 Ala. 630, 7 South Rep. 108; State v. Atlantic City & S. R. Co., 77 N. J. L. 465, 72 Atl. Rep. 111.

There are some exceptions to this rule, but it is not necessary to discuss them here, as they do not apply to the conditions in this case.

If the corporations which sought to exercise the right of ownership in the Florida corporations was also a Florida corporation, a different question would be presented.    But here we have a Maine corporation attempting to hold all the stocks of a Florida Railroad Corporation, and justifying it under a statute of Maine that permits one corporation to own stock in another.   So far as the law of Maine, and of other States which have similar statutes is concerned, it seems that under certain circumstances such ownership will be permitted, but even that has been questioned, where the stock sought to be held by a Maine corporation, is that of a corporation organized under the laws of a State, which has no such legislative sanction.    This question arose in Hyams v. Old Dominion Co., 113 Me. 294, 93 Atl. Rep. 747, and while the court decided that the Maine Company could hold stock in a New Jersey Company, it distinctly based its decision in the New Jersey statute, and recognized the principle that notwithstanding what the Maine law might permit, the question must be determined upon the law of the State where the corporation whose stock the Maine Company sought to hold, was organized, and said: "But here the question is, can a Maine corporation hold stock in a New Jersey corporation?" The court then discussed several New Jersey cases, and announced its conclusion as follows:    "It is our judgment that the law of

New Jersey permits a corporation of another State, when empowered by its own State to do so, to hold shares in a New Jersey corporation." There is no authority in the Florida law for the stock of a Florida Railroad corporation, to be owned or controlled by a foreign corporation, and as the contracts of May 10th and 11th, required the Apalachiola Northern Railroad Company to do and in pursuance thereof, they did that which is contrary to the public policy of Florida, the delivery of all the stock of the Apalachicola Northern Railroad Company to the Maine Company so as to deprive the stockholders of the Railroad Company of all control over it was *ultra vires* and wholly void. The purpose of the Maine Company in acquiring all the stock of the Apalachicola Northern Railroad Company was to enable it to manage and control the business of these corporations. In discussing a similar transaction, Judge Lurton said: "The purpose and intent in granting a charter, is that the corporation shall carry on its business through its own agents, and not through the agency of another corporation. The public policy of this state will not permit the control of one corporation by another. Especially is this true when a foreign corporation thus undertakes to control and swallow up a domestic company." Buckeye Marble & Freestone Co. v. Harvey, 92 Tenn. 115, 20 S. W. Rep. 427, 18 L. R. A. 252. See Franklin Company v. Lewiston Institution for Savings, 68 Me. 43; Franklin Bank of Cincinnati v. Commercial Bank of Cincinnati, 36 Ohio St. 350; Elkens v. Camden & Atlantic R. Co., 36 N. J. Eq. 5; Parsons v. Tacoma Smelting & Refining Co., 25 Wash. 492, 65 Pac. Rep. 765; Taylor v. Griswold, 14 N. J. L. (2 Green) 222.

Having discussed what was done in pursuance of the provisions of the contracts, I will now consider those

things which were done in violation of them, or without their authority.

The bill alleges that on May 10th and 11th, the capital stock of the Apalachicola Northern Railroad Company was five hundred thousand dollars; but the contract of May 11th states that its capital stock was two million dollars, and that of the St. Joseph Land and Development Company was one million dollars. The bill further charges that thereafter Whitaker and Company and Van Riper wrongfully and without legal authority, and without any person subscribing therefor, caused certificates for three million dollars stock of the Apalachicola Northern Railroad Company and two million dollars stock of the St. Joseph Land and Development Company to be issued in the name of Charles B. Duffy and caused Duffy to endorse the same in blank, but never delivered them to him, but they were retained by Whitaker and Company and Van Riper, and by them delivered to the Illinois State Trust Company which held them when this suit was instituted; that neither the Illinois State Trust Company nor the Florida Company, nor anyone else ever paid the Railroad Company or the Land Company a cent for the stocks so issued.

There may be some sanction in the contract of May 11th, for the Railroad Company to increase its capital stock from five hundred thousand dollars to two million dollars, but there is absolutely none for increasing it to three million dollars; neither was there any authority to increase the capital stock of the Land Company from a million to two million dollars. The only answer made by appellees to this is, "What difference did it make whether the amount of stock was two thousand dollars or five million dollars, when the proportional interest of ownership was not changed or affected?" We might

adopt the method of answering this question by asking another, "If it made no difference, why did the defendants do it?" A better answer is that these increases were not contemplated or authorized by the contracts, and were in violation thereof, and if no wrong had been done the *bona fide* stockholders no one would be here complaining; but when a scheme is shown to freeze out the complainants, and denude them of all their properties, they have a right to complain of these acts as in violation of the contracts, and invoke the aid of the courts to have the property returned to its rightful owners.

A contract which shows an evident intention to do illegal acts, or to defraud unsuspecting parties, however skillfully drawn with the object of concealing its true purpose, and evading the provisions of the law against fraud and for the protection of property rights from designing persons who desire to acquire them, should be strictly construed against those who seek to drive an unconscionable bargain, or to take by chicanery the property of another, and such parties held to compliance with the terms of the contract.

The voting trust was not authorized to thus increase the capital stock, and in doing so, it acted in bad faith towards the complaintants, and was guilty of a breach of trust, and its acts will be regarded as part of the fraudulent scheme which the bill discloses.

I am quite satisfied that the mutual pledging of the stocks and bonds of the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company for the benefit of each other, and the pledging of such stocks and bonds for the security of a bond issue of a foreign corporation, and the voting trust created and operated for the purpose of fraudulently depriving the stockholders of these companies of their stock, and their valu-

able ·franchises, subsidies, options, lands and other properties, were all· illegal acts contrary··to public policy, *ultra vires*, and void.   It follows therefore that the complainants   are   not   estopped· to pursue  their··remedy against the beneficiaries of 'these illegal transactions.

The rule recognized in the Supreme Court of the United States is thus stated in Central Tramsp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 11 Sup. Ct. Rep. 478:  "A contract of a corporation which  is *ultra  vires*, in  the proper sense, that is to say, outside  the   object of its creation as defined in the law of the organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect.  The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it.   The contract cannot be ratified by either party, because it could not have been authorized by either.    No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.   When a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons connected with it, may be estopped to deny that it has complied with  the  legal   formalities  which   are prerequisites to its existence or to   its action,   because such requisites might in fact have been complied with.    But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation, nor the other party to the contract, can be estopped, by assenting to it, or by acting upon it, to show that it was prohibited by those laws."    See also First Nat. Bank v. American Nat. Bank, 173 Mo. 153, 72 S. W. Rep. 1059; Ellett-Kendall Shoe Co. v. Western Stores Co., 132 Mo. App. 513, 112 S. W. Rep. 4; Jacksonville, M. P. Ry. & Nav. Co. v. Hooper,

160 U. S. 514, 16 Sup. Ct. Rep. 379, and Anglo-American Land, M. & A. Co. v. Lombard, 132 Fed Rep. 721, where Judge Van Devanter after stating the rule laid down in Central Transportation Co. v. Pullman Car Co., *supra,* said: "Defendants transfer of their stock in the Kansas Company was a nullity. Nothing done in pursuance of the transfer, no acquiescence therein, and no receipt of profit therefrom, could infuse validity into that act, or prevent the successful assertion of its nullity. The claimed estopped is not tenable."

In Union Pac. R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 16 Sup. Ct. Rep. 1173, the court said: "A contract made by a corporation * * * beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable by the application of the doctrine of estoppel." See also De la Vergne Refrigerating Mach. Co. v. German Sav. Inst., 175 U. S. 40, 20 Sup. Ct. Rep. 20; Metropolitan Trust Co. of New York v. McKinnon, 172 Fed. Rep. 846; Barron v. McKinnon, 196 Fed. Rep. 933; Interstate Trust & Banking Co. v. Reynolds, 127 La. 193, 53 South Rep. 520; Gair Co. v. Columbia Rice Packing Co., 124 La. 193, 50 South. Rep. 8; California Sav. Bank v. Kennedy, 167 U. S. 362, 17th Sup. Ct. Rep. 831; Gaston & Ayers v. J. I. Campbell Co., 104 Tex. 576, 140 S. W. Rep. 770; 141 S. W. Rep. 515; National Car Advertising Co. v. Louisville & N. R. Co., 110 Va. 413, 66 S. E. Rep. 88, 24 L. R. A. (N.S.) 1010.

It is contended that these contracts were made by individuals, and that the doctrine of *ultra vires* does not apply. It is true, the contracts were between individuals, but they provided for certain things to be done by the corporations, such as one pledging its stocks and bonds for the security of the other, and for both to pledge

their stocks and bonds as security for a bond issue of a foreign corporation. These acts were outside the purposes of their creation and the fact that the contracts to do these things were executed by the stockholders and others, cannot sanction the illegal acts done by the corporations in pursuance of the policy of the contracts. These acts, by the corporations, were outside their powers, *ultra vires* and void.

The decisions in all the cases cited by appellees in support of their contention that the defense of *ultra vires* is not available for these complainants, are predicated on the principle that "a man who enjoys a privilege has no right to say that because he ought not to have enjoyed it, he will not pay for it." This principle is not applicable to the facts disclosed by the bill in the case at bar, for these complainants received nothing,—enjoyed nothing. It would indeed be a sunny temperament that could find enjoyment in losing several thousands of dollars invested in an enterprise that gave promise of large profits, and properties, franchises, subsidies and options valued at several million of dollars, and being denuded of their stocks, to say nothing of the time and labor and energy expended in organizing the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company and getting them in such a condition that they could be used as the basis for a loan of a million and a half dollars.

The doctrine of estoppel has its basis in the policy of law, to promote fair dealing, and it will not be permitted to be used in aid of a self confessed scheme to defraud and to ratify *ultra vires* acts, and to validate contracts against public policy. City of St. Louis v. Davidson, 102 Mo. 149, text 154, 14 S. W. Rep. 825.

I will now examine the appellees' contention that the

complainants have not offered to do equity.    The complainants are not seeking to retain any benefits received by them or conferred on their properties, without reimbursing those who in good faith advanced money for, or rendered services to the same; nor do they seek to deprive the defendants of aught that they equitably are entitled to; they ask that any amount due the Pine Forest Land Company be adjudged a lien upon the lands and properties of the St. Joseph Land and Development Company; that whatever is rightfully due  the Morey  Engineering and Construction Company be adjudged   a   lien    upon the properties of the Apalachicola  Northern  Railroad Company subject to a prior lien in favor of persons who *bona fide* subscribed and paid for the $1,500,000.00 first mortgage bonds of the Florida Company to the extent that the money so derived was used and expended in the construction of the road; that an accounting be had and it be ascertained and adjudged how much and how many of the proceeds of the sale of the Florida Company's first mortgage interest bearing bonds  for a million  five hundred thousand dollars or was used for the benefit of the Apalachicola Northern Railroad Company, and how much for the St. Joseph Land  and Development  Company,  and such amounts be declared   liens on the   properties and lands of each of said companies separately, to the extent of the benefits received by said companies  respectively and separately.    The contention of appellees that  the complainants have not offered to do equity is untenable.

I do not think that the bill is open to attack as multifarious.    All the matters contained in the bill radiated from a common center and the bill discloses and alleges that the acts and doings of the various defendants were part of a general scheme to defraud complainants.

What was said by Lord Cottingham on the subject of

multifariousness has been cited approvingly by the Supreme Court of the United States and is generally recognized by the States. In Campbell v. Mackie, 1 Milney and Craig *603, the Lord Chancellor said: "To lay down any rule, applicable universally, or to say what constitutes multifariousness as an abstract proposition, is, upon the authorities utterly impossible."

Mr. Story, in his work on Equity Pleading (10th. ed.) Sec. 539, says: "The conclusion, to which a close survey of all the authorities will conduct us, seems to be, that there is not any positive, inflexible rule, as to what, in the sense of courts of equity, constitutes multifariousness, which is fatal to the suit on demurrer."

In Oliver v. Piatt, 3 How. (U. S.) 333, the court said: "We are of the opinion that the bill is in no just sense multifarious. It is true that it embraces the claim of both the companies; but their interests are so mixed up in all these transactions that an entire justice could scarcely be done, at least not conveniently done, without a union of the proprietors of both companies; and if they had not been joined, the bill would have been open to the opposite objections that all the proper parties were not before the court, so as to enable it to make a final and conclusive decree touching all their interests, several as well as joint." This is peculiarly applicable to the case at bar.

The complainants with W. H. Hemphill, one of the defendants, owned all the stocks of the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company and owned certain lands, properties, franchises, subsidies and options. They tried to borrow money with which to build and equip the railroad, and finish paying for the lands, and secure their subsidies, and franchises. Contracts were made

by some of the stockholders with Whitaker and Company and J. C. Van Riper, by which the latter and their associate defendants got possession of the stock of the Apalachicola Northern Railroad Company and the St. Joseph Land and Development Company, who then organized and controlled certain other corporations, and entered into an extensive scheme to wreck the Railroad and Land Companies and get possession of them, and all the properties, lands, options, franchises and subsidies, of the complainants. All the parties defendant were in some way connected with the scheme, or were parties to or beneficiaries thereof, and every wrong for which a remedy is prayed, was a part of the same. There is no way in which justice can be done between all the various parties and interests, in separate suits, nor could suits be brought for or against any of the parties less than all, wherein the rights of one set of litigants would not be affected by the rights, duties or obligations of the others.

"To render a bill, multifarious, it must contain two or more good grounds of suit, which cannot be joined in the same bill against the same or different defendants." Rich v. Eichelberger, 13 Fla. 169. The interests of all the parties are so mixed that entire justice cannot be done by any separate action or any number of separate actions. References to the Florida decisions can be found in Murrell v. Peterson, 57 Fla. 480, 49 South. Rep. 31, where there is a very edifying discussion of the subject of multifariousness by Mr. Justice SHACKLEFORD formerly of this court. See also Farrell v. Forest Inv. Co., 73 Fla. 191, 74 South. Rep. 216; Craft v. Craft, 74 Fla. 262, 76 South. Rep. 772.

Appellees contend that the decision of the United

States Circuit Court for Illinois, in a proceeding for an ancillary injunction is conclusive here.

While this cause was pending in Florida, an application was made to the Circuit Judge for an injunction against the foreclosure of the mortgage against the Florida Company. This the Circuit Judge refused on the ground that the stock and bonds were personal property and were held in Illinois by the Illinois State Trust Company. The complainants applied for and obtained a temporary restraining order from the United States Circuit Court; subsequently this temporary restraining order was dissolved, and the court refused to grant an injunction. Thereafter the court on motion of complainants entered an order that the suit be "dismissed by complainants without prejudice." As no issues were determined in that suit except as to the application for an injunction as ancillary to the suit pending in Florida, and as the bill was dismissed without prejudice, the decision in that case is not conclusive of the issues presented here.

It is contended by appellees that the complainants are barred by laches. The contracts were made in May, 1905. The reorganization scheme was proposed September 13, 1907. The original bill of complaint was filed December 9, 1907. Service was made on the Morey Engineering Construction Company on July 9, 1908, on R. H. Hemphill and the St. Joseph Land and Development Company on March 10, 1908, and on Edwards Whitaker, Xenophon B. Wilfley, the Florida Company and E. A. Faulhaber on the 19th of March, 1908. When the original bill was filed the bonds of the Florida Company had not matured. As the original bill in this case was filed December 9, 1907, and as the second amended bill which we have under consideration, is but a con-

tinuation of the suit begun by the original bill, it is very clear that the complainants are not guilty of laches.

As there is equity in the bill, and for the reasons set forth herein, I think the demurrers should have been overruled, and I concur in the judgment of the court that the interlocutory order of February 5th, 1916, sustaining the demurrers to the bill, be reversed.